ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
CALENDAR: W
PAGE 1 of 33
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

Firm No. 33057

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

NEIL REYES,

        Plaintiff,

    v.

DEPUTY CHIEF BOBBY WALKER,
COMMANDER TODD LAW, and SOO LINE
RAILROAD COMPANY D/B/A CANADIAN
PACIFIC,

        Defendants.

Case No. 2017-L-011381

Calendar W

## FIRST AMENDED COMPLAINT

NOW COMES the Plaintiff, Neil Reyes (hereinafter "Plaintiff"), by and through his

attorneys, Kara Amouyal, Esq. and Blake Horwitz, Esq., of The Blake Horwitz Law Firm, Ltd.,

complaining of Deputy Chief Bobby Walker, Commander Todd Law, and Soo Line Railroad

Company d/b/a Canadian Pacific, and states as follows:

### A. PARTIES

1.   Plaintiff is a resident of Cook County, Illinois.

2.   Plaintiff is an Asian male.

3.   Defendant Walker is a resident of the State of Illinois.

4.   Defendant Law is a resident of the State of Illinois.

5.   Canadian Pacific (hereinafter "CP") is a railroad company headquartered in Calgary,

Alberta.



EXHIBIT

B-9

6.    Soo Line Railroad is a United States subsidiary of CP, headquartered in Minneapolis, Minnesota.

## B.  JURISDICTION AND VENUE

7.    This action is brought pursuant to 42 U.S.C. § 2000e ("Title VII"), 42 U.S.C. § 12101 *et. seq.* and regulations 29 C.F.R. Part 1630 ("ADA"), 29 U.S.C. § 2601 *et seq.* and regulations 29 C.F.R. Part 825 ("FMLA"), and Illinois state law.

8.    At all relevant times, Defendant CP was subject to Title VII of the Civil Rights Act of 1974 ("Title VII"), 42 U.S.C. § 2000e.

9.    At all relevant times, Defendant CP was subject to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.*, and its 2008 amendments ("ADAA") and regulations.

10.    At all relevant times, Defendant CP was subject to the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.,* and its regulations.

11.    Defendant CP's Bensenville Intermodal Terminal ("Bensenville Terminal") is located in Franklin Park, Illinois.

12.    Franklin Park, Illinois is located within Cook County, Illinois.

13.    At all relevant times, Plaintiff was an employee of CP working at the Bensenville Terminal.

14.    Venue is appropriate in this Court because the events alleged in this Complaint took place in this District.

## C.  FACTS CONCERNING THE STRUCTURE AND RACIAL MAKEUP OF CPPS

15.    CP's Police Services ("CPPS") is a railway law enforcement agency.

16.    Part of CPPS' force is in the United States.

17.    CPPS' United States command structure is as follows: special agent - Sergeant – Commander – Deputy Chief.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011581
PAGE 2 of 33

2

18. Plaintiff began working with CPPS in 2010.

19. At all relevant times, Plaintiff had a valid expectation of continued employment with CP.

20. At all relevant times, the Defendants were aware that Plaintiff was employed by CP.

21. At all relevant times, Plaintiff was not represented by a collective bargaining agent or subject to a Collective Bargaining Agreement.

22. At all relevant times, Plaintiff worked part-time with the Triton College Police Department.

23. At all relevant times, Defendant Law and Defendant Walker were aware that Plaintiff was employed by Triton College.

24. At the time he was hired by CP, Plaintiff's rank was special agent.

25. At the time that Plaintiff was hired by CP, there were no minorities working for CPPS above the rank of special agent.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 3 of 33

26. In 2010, a Sergeant position in Wisconsin became available.

27. A white male was promoted to the position of Sergeant over minority candidates.

28. In 2016, a Sergeant position in Iowa became available.

29. A white male was promoted to the position of Sergeant over two minority candidates.

30. These two minority candidates had comparable work experience and more time with CPPS than the white male who was picked for the Sergeant position in Iowa.

31. In 2012, Plaintiff was promoted to Sergeant.

32. Plaintiff became the only CPPS supervisor with any minority employees working under him.

33. That is, at all relevant times, the Bensenville Terminal had the only minority special agents in the entire United States.

3

34. CPPS has never employed any minority special agents in any location in the United States other than the Bensenville Terminal.

35. After Plaintiff was terminated, a white male was promoted to take his place over a minority candidate.

36. The minority candidate had comparable work experience and almost 10 more years of employment with CPPS than the white male who was chosen for the Sergeant position at the Bensenville Terminal.

37. In 2016, Defendant Walker was the highest-ranking officer in the United States.

38. At all relevant times, Defendant Law was the Commander to whom Plaintiff reported.

### D. FACTS CONCERNING THE RELEVANT POLICIES AND PROCEDURES OF CPPS

39. At all relevant times, CPPS maintained a Policies and Procedures Manual.

40. In 2013, CPPS updated and re-issued its Policies and Procedures Manual ("the Manual"). [Ex. A, 2013 Policies and Procedures Manual (introductory pages only)].

41. The Manual remained in effect until Plaintiff was terminated on January 4, 2017.

42. Plaintiff received the Manual in 2013.

43. Plaintiff continued working after receiving the Manual.

44. Per the Manual, Plaintiff was responsible for knowing and complying to the policies and procedures laid out in the Manual. [Ex. A, p. 2, par. 6].

45. The Manual does not contain a provision disclaiming a contract. [Ex. A].

46. The Manual constitutes a contract between CP and Plaintiff for 2013-Plaintiff's termination.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 4 of 33

4

47. Per the Manual, an employee who is subject to discipline shall either be disciplined through Corrective Discipline or the Disciplinary Investigation System. [Ex. B, Policies and Procedures Manual, 1.2 Discipline, p. 9-17].

48. The Disciplinary Investigation System consists of an informal investigation process or a formal investigation process. [Ex. B, p. 13-17].

49. Per the Manual, Corrective Discipline and the informal investigation process are not appropriate serious misconduct [Ex. B, p. 9, par. 1(g), p. 13, par. 1].

50. Per the Manual, employees undergoing the formal investigation process in the Disciplinary Investigation System are due a hearing: that is "presided over by a senior officer acting as a hearings officer"; that is recorded; wherein the employee is "provided with copies of any documentation presented at the hearing"; wherein the employee is "present during examination of any witness whose testimony may have a bearing on their responsibility"; wherein the employee "may offer rebuttal evidence" and "may give evidence to refute any allegations or offer additional explanation relating to the event". [Ex. B, p. 14].

51. Per the Manual, prior to the hearing, employees: "will be given seven business days' notice" which must be "in writing and contain the time, date, place and subject matter of the hearing". [Ex. B, p. 14].

52. Per the Manual, if the employee is suspended from duty, "the hearing will take place as soon as practicable following the event(s) in question". [Ex. B, p. 14].

53. Per the Manual, the employee is given the right to appeal the hearing officer's decision concerning discipline. [Ex. B, p. 15].

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 5 of 33

5

54. Per the Manual, if the employee is dismissed for misconduct, "the member will be provided with written documentation from HR/LR that" gives "the reason for the dismissal…the effective date of the dismissal…" and an explanation of benefits. [Ex. B, p. 14-15].

55. Per the Manual, managers and supervisors are to ensure "that disciplinary matters are dealt with expeditiously and confidentially and in accordance with CPPS disciplinary procedures" and "that confidentiality is respected at all times". [Ex. B, p. 1].

56. CPPS also maintains a Return to Work Policy. [Ex. C].

57. Plaintiff received the Return to Work Policy ("RTW policy") when he began working for CPPS.

58. Plaintiff continued working for CPPS after receiving the Return to Work Policy.

59. The RTW Policy covers employees who are medically unable to work for short or long periods of time, or who are medically unable to maintain the same job functions for short or long periods of time. [Ex. C].

60. The purpose of the RTW Policy is to allow employees who suffer an injury on or off the job to return to work, either by taking leave or by modifying or restricting work duties. [Ex. C].

61. The RTW Policy lays out the procedures through which the employee, the employee's supervisor, and a healthcare provider work together to allow the employee to return to work. [Ex. C].

62. The RTW Policy states that "key stakeholders may encounter personal and sensitive information, which must be maintained confidential to the key stakeholders involved" and that "key stakeholders will restrict information to work limitations and/or restrictions of the individual, and not medical information or diagnosis". [Ex. C, p. 10-11].

63. A supervisor is a key stakeholder. [Ex. C, p. 5].

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 6 of 33

6

### E. **FACTS CONCERNING DIFFERENTIAL TREATMENT ON THE BASIS OF RACE**

#### I. Plaintiff Received Less Pay and Fewer Benefits Than His White Counterparts

64. Once Plaintiff was promoted to Sergeant, his compensation was less and benefits worse than his non-Asian counterparts.

65. Some of Plaintiff's subordinates had a larger salary than Plaintiff.

66. None of these subordinates were Asian males.

67. Plaintiff was given a smaller salary because of his race.

68. Plaintiff also had fewer and worse fringe benefits than his non-Asian counterparts.

69. Plaintiff had fewer and worse fringe benefits because of his race.

70. For example, from 2012-2015, Plaintiff's white counterparts were allowed to take home their squad cars while Plaintiff was not able to do so for many years.

71. Plaintiff also had less vacation time than his non-Asian counterparts.

72. Plaintiff's subordinate, Bruce Nichols, a white male, was given an extra week of vacation based on prior police experience.

73. Mr. Nichols was not given this extra time at the time of his hire.

74. Rather, CP changed Mr. Nichols' vacation time after Mr. Nichols began working for CP.

75. Plaintiff had prior police experience as well.

76. Once Plaintiff learned of Mr. Nichols' extra vacation time, Plaintiff requested to receive the same.

77. CP denied Plaintiff's request.

78. CP did so because of Plaintiff's race.

79. Plaintiff did not have his own workspace while his white counterparts did.

80. Plaintiff was denied his own workspace because of his race.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 7 of 33

II. Plaintiff was Forced to Complete Additional Menial Tasks that Other White Sergeants Were Not Forced to Do

81. At the time that Plaintiff became Sergeant, Ray Holman was the Deputy Chief.

82. Before Plaintiff accepted the promotion to Sergeant, Mr. Holman told Plaintiff that Plaintiff would primarily handle field supervisory duties and that the only administrative work for which Plaintiff would be responsible would be to approve reports and maintain work schedules for special agents.

83. However, after Plaintiff accepted the promotion to Sergeant, CP changed the job duties from those that the prior Bensenville Sergeant had performed.

84. Once he became Sergeant, CP forced Plaintiff to complete menial tasks.

85. For example, Plaintiff was made to go to local grocery stores to purchase drinks and refreshments.

86. Plaintiff was made to go to Dunkin Donuts to pick up donuts.

87. Plaintiff was made to go to local restaurants to pick up large lunch orders.

88. Plaintiff was made to locate, price, and arrange training venues.

89. Plaintiff was made to take Defendant Law's vehicle to the carwash.

90. Additionally, Defendant Walker treated Plaintiff like a valet for the entire Walker family concerning their personal travel.

91. For example, when Defendant Walker would travel for personal reasons, Defendant Walker would drive his CPPS squad car to the Departures area of the airport and would require Plaintiff to meet him there.

92. Defendant Walker insisted that Plaintiff arrive before Defendant Walker and that Plaintiff then assist in unloading Defendant Walker's family's suitcases.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 8 of 33

8

93. Defendant Walker also forced Plaintiff to bring along another officer on these personal errands so that the other officer could drive Defendant Walker's squad car back to the Bensenville Terminal.

94. Defendant Walker did not force Plaintiff's white counterparts to do the same.

95. Defendant Walker forced Plaintiff to do so because of Plaintiff's race.

96. These menial tasks were outside of the job duties for a Sergeant when Plaintiff was promoted to Sergeant.

97. That is, CP changed the terms and conditions of Plaintiff's job once he was promoted to Sergeant.

98. Plaintiff's white counterparts were not forced to complete such menial tasks.

99. Plaintiff's predecessor, a white male, was not forced to complete such menial tasks.

100. Plaintiff was forced to complete these tasks routinely during his time as Sergeant with CPPS.

101. Plaintiff was forced to complete these menial tasks because of his race.

### III. Plaintiff was Forced to Complete Additional Tasks that Other White Sergeants Were Not Forced to Do

102. As stated above, after Plaintiff accepted the promotion to Sergeant, CP changed the job duties from those that the prior Bensenville Sergeant had done.

103. In addition to the above-listed menial tasks, Plaintiff was forced to complete additional tasks that his white counterparts were not forced to complete.

104. Plaintiff was forced to complete the below-described additional tasks because of his race.

105. For example, prior to Plaintiff's promotion to Sergeant, responsibilities for planning training for the U.S. special agents were shared amongst the U.S. Sergeants.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 9 of 33

9

106. Once Plaintiff became Sergeant, he became solely responsible for training of the U.S. special agents.

107. Once Plaintiff became Sergeant, his white counterparts were not responsible for training of the U.S. special agents.

108. Plaintiff's white predecessor was not solely responsible for the training of the U.S. special agents.

109. Prior to Plaintiff's promotion to Sergeant, responsibilities for outfitting the squad cars was shared amongst the U.S. Sergeants.

110. However, in 2016, Plaintiff was made to outfit the squad cars for the entire U.S.

111. Plaintiff's white counterparts were not responsible for outfitting the squad cars.

112. Plaintiff's white predecessor was not solely responsible for outfitting the squad cars.

113. While Plaintiff was programming the recording modules for the squad cars, Defendant Walker and Defendant Law ridiculed and demeaned Plaintiff.

114. For example, Defendant Walker and Defendant Law said things like "I thought you were a police officer, not I.T."

115. Prior to Plaintiff's promotion to Sergeant, each Sergeant throughout the U.S. was responsible for receiving and coordinating any shipments for his detachment.

116. Once Plaintiff became Sergeant, he became solely responsible for receiving and distributing all shipments for the entire United States.

117. Once Plaintiff became Sergeant, his white counterparts were not responsible for coordinating shipments for their detachments.

118. Plaintiff's white predecessor was not solely responsible for receiving and distributing all shipments for the entire United States.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 10 of 33

10

119. Plaintiff was forced to complete these tasks routinely during his time as Sergeant with CPPS.

120. Additionally, once Plaintiff became Sergeant, CPPS forced Plaintiff to integrate CPPS data with the Illinois State Police database.

121. CPPS had not forced any of Plaintiff's white predecessors to do so.

122. CPPS insisted that Plaintiff complete this project quickly.

123. CPPS insisted that Plaintiff complete this project in addition to Plaintiff's other job responsibilities.

IV. The Bensenville Attachment Was Treated Worse Than the Other, All-White Attachments

124. As stated above, the Bensenville Terminal was the only unit that had minority special agents.

125. CPPS treated the Bensenville attachment differently than the other, all-white attachments.

126. CPPS did so on the basis of race.

127. For example, in September of 2016, Defendant Law accused Plaintiff of being in a "clique" with two Hispanic special agents from the Bensenville attachment.

128. Defendant Law did not accuse Plaintiff of being in a "clique" with any of the white agents when Plaintiff spent the same amount of time with them as with the Hispanic special agents.

129. Defendant Law accused Plaintiff of being in a "clique" with the Hispanic special agents because Plaintiff and the Hispanic agents are minorities.

130. That is, Defendant Law did so because of Plaintiff's race.

131. Further, the officers at the Bensenville attachment were not allowed carry CPPS-issued firearms or personally-owned firearms off-duty under their police authority.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 11 of 33

11

132. So long as it was not prohibited by state law, CPPS allowed the other all-white attachments to carry their CPPS-issued firearms or personally-owned firearms off-duty under their police authority.

133. Plaintiff contacted the Illinois State police law review division and was informed that Illinois law did not prohibit CPPS officers from carrying their CPPS-issued firearms or personally-owned firearms off-duty under their police authority.

134. Still, CPPS refused to allow Plaintiff and the rest of the Bensenville attachment to carry their CPPS-issued firearms or personally-owned firearms off-duty under their police authority.

135. Plaintiff was therefore forced to obtain a concealed carry permit.

136. For the all-white detachment in Minnesota, CPPS paid the costs for the officers to obtain their concealed carry permits.

137. CPPS refused to pay for Plaintiff's concealed carry permit.

138. In September of 2016, during a conference call with all U.S. officers, Plaintiff brought up this issue to Defendant Walker.

139. Defendant Walker reacted by singling out and screaming at Plaintiff for raising the issue.

140. During the conference call, other white Sergeants and special agents also provided feedback and raised issues with Defendant Walker.

141. Defendant Walker did not correspondingly scream at or otherwise scold the white officers who did so.

142. Defendant Walker singled out Plaintiff and screamed at him because of Plaintiff's race.

143. After the call, several other special agents and Sergeants commented on and teased Plaintiff for the treatment that he received from Defendant Walker.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 12 of 33

12

V. Defendant Law Made Comments About Plaintiff Being Subjected to Race Discrimination

144. In early 2016, Defendant Law told Plaintiff that it was likely that Plaintiff had been subjected to racial discrimination.

145. Defendant Law said that white males with blonde hair and blue eyes would typically be more successful in the workplace.

146. Because Plaintiff would never be blonde or have blue eyes, Defendant Law recommended that Plaintiff read some books to improve his other strengths.

## F. FACTS CONCERNING PLAINTIFF'S LEAVE AND TERMINATION

I. Plaintiff Confronted Defendant Law with a Lie and Various Racial Discriminations

147. On November 9, 2016, Plaintiff was on-duty.

148. On November 9, 2016, Defendant Law was on-duty.

149. On November 9, 2016, Defendant Walker was on-duty.

150. On November 9, 2016, while Plaintiff was on-duty, two other Special Agents were also on duty.

151. On November 9, 2016, while on-duty, Plaintiff was armed with his duty weapon.

152. On November 9, 2016, while on-duty, Plaintiff had a conversation with Defendant Law ("the conversation").

153. Prior to the conversation, Defendant Law had maintained that Defendant Law did not participate in any decision concerning Plaintiff's salary.

154. Prior to the conversation, Plaintiff learned that this was a lie ("the lie").

155. At the beginning of the conversation, Plaintiff spoke to Defendant Law about Plaintiff's planned vacation for the next week.

156. Defendant Law suggested that Plaintiff start his planned vacation early and go relax.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 13 of 33

13

157. In response, Plaintiff made a joke ("the joke").

158. In response to the joke, Defendant Law laughed.

159. After the joke, the conversation continued for at least ten (10) minutes.

160. After the joke, Plaintiff confronted Defendant Law about the lie.

161. After the joke, Plaintiff confronted Defendant Law about the various above-described racial discriminations.

162. Confronting Defendant Law about the lie and the various above-described racial discriminations is a protected activity.

163. After Plaintiff confronted Defendant Law about the lie and the above-described racial discriminations, Defendant Law ended the conversation.

164. Plaintiff did not cry during the conversation.

165. After ending the conversation, Defendant Law drove Plaintiff to Plaintiff's home.

166. At no point during the conversation or when driving Plaintiff to Plaintiff's home did Defendant Law command Plaintiff to turn over his service weapon.

167. At no point during the conversation or before leaving the Bensenville Terminal did Defendant Law ask a Special Agent for assistance in disarming Plaintiff.

168. Defendant Law dropped Plaintiff off at Plaintiff's home at or around 1:00 p.m.

169. After driving Plaintiff to Plaintiff's home, Defendant Law returned to the Bensenville Terminal.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 14 of 33

14

II. <u>Defendant Law and Defendant Walker Conspired Against Plaintiff and Spread False Statements About Plaintiff</u>

170. Between 1:00 p.m. and 3:00 p.m., Defendant Law engaged in a communication with Defendant Walker regarding Plaintiff.

171. During the communication, Defendant Law and Defendant Walker conspired to make false statements about Plaintiff to discredit Plaintiff.

172. Additionally, and/or alternatively, during the communication, Defendant Law and Defendant Walker conspired to have Plaintiff terminated from CP.

173. That is, during the communication, Defendant Law and Defendant Walker agreed to facilitate, engage in, and/or support the activities that ultimately led to Plaintiff being terminated from CP, as described below.

174. Defendant Law and Defendant Walker did so because of Plaintiff's race.

175. Additionally, and/or alternatively, Defendant Law and Defendant Walker did so to retaliate against Plaintiff for confronting Defendant Law about the lie and the above-described racial discriminations.

176. Terminating Plaintiff was not in the business interest of CP.

177. On November 9, 2016, after communicating with Defendant Walker, Defendant Law communicated with special agent Jesus Ramos.

178. This communication took place at or around 3:00 p.m.

179. Defendant Law told Mr. Ramos that Plaintiff was suicidal.

180. This statement was false.

181. Defendant Law knew this statement was false.

182. Defendant Law made this statement in furtherance of the above-described conspiracy.

183. Defendant Law told Mr. Ramos that Plaintiff threatened to kill himself.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 15 of 33

184. This statement was false.

185. Defendant Law knew this statement was false.

186. Defendant Law made this statement in furtherance of the above-described conspiracy.

187. Defendant Law told Mr. Ramos that Plaintiff was sent home early from his shift because he was suicidal.

188. This statement was false.

189. Defendant Law knew this statement was false.

190. Defendant Law made this statement in furtherance of the above-described conspiracy.

191. On November 9, 2016, after communicating with Defendant Walker, Defendant Law communicated with special agent Ben Pepich.

192. This communication took place at or around 3:00 p.m.

193. Defendant Law told Mr. Pepich that Plaintiff was suicidal.

194. This statement was false.

195. Defendant Law knew this statement was false.

196. Defendant Law made this statement in furtherance of the above-described conspiracy.

197. Defendant Law told Mr. Pepich that Plaintiff threatened to kill himself.

198. This statement was false.

199. Defendant Law knew this statement was false.

200. Defendant Law made this statement in furtherance of the above-described conspiracy.

201. Defendant Law told Mr. Pepich that Plaintiff was sent home early from his shift because he was suicidal.

202. This statement was false.

203. Defendant Law knew this statement was false.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 16 of 33

204. Defendant Law made this statement in furtherance of the above-described conspiracy.

205. Plaintiff was sent home early after confronting Defendant Law about the above-described lie and race discriminations.

206. Defendant Law made these above-described false statements because Plaintiff confronted Defendant Law about the above-described lie and race discriminations.

III. Plaintiff Was Placed on Leave and Eventually Terminated

207. On November 10, 2016, Plaintiff attempted to tell Defendant Walker about the November 9, 2016 conversation with Defendant Law.

208. Plaintiff attempted to discuss with Defendant Law the above-described lie and above-described racial discriminations.

209. Attempting to discuss these topics with Defendant Law was a protected activity.

210. Defendant Walker scolded Plaintiff by saying "knock that shit off".

211. Defendant Walker became upset with Plaintiff because Defendant Walker thought Plaintiff was threatening to file a lawsuit.

212. On November 10, 2016, Plaintiff attempted to tell the Inspector of Personnel about the November 9, 2016 conversation with Defendant Law and about his November 10, 2016 conversation with Defendant Walker.

213. The Inspector of Personnel told Plaintiff that before being subjected to discipline, including termination, Plaintiff would go through the above-described formal investigation process. [Ex. B, p. 13-17].

214. On November 15, 2016, Defendant Law placed Plaintiff on leave effective November 9, 2016.

215. Defendant Law placed Plaintiff on leave because of Plaintiff's race.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 17 of 33

216. Additionally, and/or alternatively, Defendant Law placed Plaintiff on leave in retaliation against Plaintiff for confronting Defendant Law about the lie and the above-described racial discriminations.

217. Additionally, and/or alternatively, Defendant Law placed Plaintiff on leave in furtherance of the above-described conspiracy.

218. When he placed Plaintiff on leave, Defendant Law stated that Plaintiff would have to have an assessment of his fitness to return to work completed by his treating health care provider.

219. Plaintiff completed this fitness assessment on November 21, 2016.

220. In the assessment, Plaintiff's doctor stated that Plaintiff was emotionally stable and did not have any restrictions to returning to work.

221. On November 23, 2016, CP Health Services contacted Plaintiff.

222. CP Health Services told Plaintiff that his paperwork to return to work was in order.

223. CP Health Services told Plaintiff that his paperwork was forwarded to Commander Law.

224. CP Health Services told Plaintiff that it was at the discretion of CPPS as to when Plaintiff could return to work.

225. On December 21, 2016, Plaintiff was told that he exceeded his 2016 performance objectives.

226. On January 4, 2017, Plaintiff was terminated.

227. CP terminated Plaintiff because of Plaintiff's race.

228. Additionally, and/or alternatively, CP terminated Plaintiff in retaliation for Plaintiff's above-described protected activities.

229. Defendant Law took part in the decision to terminate Plaintiff.

230. Defendant Law did so because of Plaintiff's race.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 18 of 33

18

231. Additionally, and/or alternatively, Defendant Law did so in retaliation for Plaintiff's above-described protected activities.

232. Additionally, and/or alternatively, Defendant Law did so in furtherance of the above-described conspiracy.

233. Defendant Walker took part in the decision to terminate Plaintiff.

234. Defendant Walker did so because of Plaintiff's race.

235. Additionally, and/or alternatively, Defendant Walker did so in retaliation for Plaintiff's above-described protected activities.

236. Additionally, and/or alternatively, Defendant Walker did so in furtherance of the above-described conspiracy.

237. Plaintiff was never afforded a hearing, an appeal, a written statement from HR/LR concerning his dismissal, or any other procedures outlined in the formal investigation process. [Ex. B, p. 14-16].

238. CP provided Plaintiff's non-Asian counterparts a hearing, an appeal, and the other procedures outline in the formal investigation process before termination.

239. CP denied Plaintiff these procedures because of Plaintiff's race.

240. Additionally, and/or alternatively, CP did so in retaliation for Plaintiff's above-described protected activities.

241. Plaintiff was not afforded the protections of the RTW Policy. [Ex. C].

242. CP provided Plaintiff's non-Asian counterparts the protections of the RTW Policy.

243. CP denied Plaintiff these procedures because of Plaintiff's race.

244. Additionally, and/or alternatively, CP did so in retaliation for Plaintiff's above-described protected activities.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 19 of 33

IV. <u>Defendant Law Interfered in Plaintiff's Other Employment</u>

245. As stated above, in 2016, Plaintiff worked part-time at Triton College.

246. On or around December 21, 2016, Defendant Law contacted Plaintiff's supervisors at Triton College.

247. Plaintiff did not authorize Defendant Law to contact Plaintiff's supervisors at Triton College.

248. Defendant Law told Plaintiff's supervisors about Plaintiff being on leave with CP.

249. Plaintiff did not authorize Defendant Law to tell Plaintiff's supervisors about being on leave with CP.

250. Defendant Law told Plaintiff's supervisors about Plaintiff being on leave with CP because of Plaintiff's race.

251. Additionally, and/or alternatively, Defendant Law told Plaintiff's supervisors about Plaintiff being on leave with CP in retaliation for Plaintiff's above-described protected activities.

252. Additionally, and/or alternatively, Defendant Law told Plaintiff's supervisors about Plaintiff being on leave with CP for the purpose of having Plaintiff suspended from or terminated from Triton College.

253. On information and belief, Defendant Law told Plaintiff's supervisors that Plaintiff was suicidal.

254. This statement was false.

255. Defendant Law knew this statement was false when he made this statement.

256. Defendant Law made this false statement because of Plaintiff's race.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 20 of 33

257. Additionally, and/or alternatively, Defendant Law made this false statement in retaliation for Plaintiff's above-described protected activities.

258. Additionally, and/or alternatively, Defendant Law made this false statement for the purpose of having Plaintiff suspended from or terminated from Triton College.

259. Plaintiff was consequently suspended indefinitely from Triton College.

### V. In the Alternative, CP Discriminated Against Plaintiff on the Basis of Perceived Disability

260. Alternatively, on November 9, 2016, Defendant Law regarded Plaintiff as suffering from a disability, mental illness.

261. That is, on November 9, 2016, CP regarded Plaintiff as suffering from a disability.

262. CP terminated Plaintiff because of that perceived disability.

263. As stated above, Plaintiff was never afforded a hearing, an appeal, or any other procedures outlined in the formal investigation process. [Ex. B, p. 14-16].

264. Plaintiff's counterparts that are not regarded as disabled were afforded those protections before being terminated.

265. Further, as stated above, Plaintiff was not afforded the protections of the Return to Work Policy. [Ex. C].

266. Plaintiff's counterparts that are not regarded as disabled were afforded those protections before being terminated.

### VI. In the Alternative, CP Retaliated Against Plaintiff for Attempting to Take FMLA

267. On December 30, 2016, Plaintiff sent an email to Defendant Law and Human Resources.

268. Plaintiff requested FMLA from May 1, 2017 to June 28, 2017.

269. Plaintiff requested the FMLA for the birth of his child.

270. Defendant Law responded and said he would review the request after the first of the year.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 21 of 33

271. Plaintiff was terminated on January 4, 2017.

272. Plaintiff was terminated for attempting to invoke his rights pursuant to FMLA.

## G. ADMINISTRATIVE PREREQUISITES

273. On March 9, 2017, Plaintiff submitted a Charge of Discrimination to the Equal Employment Opportunity Commission ("EEOC"). [Ex. D, p. 2-8].

274. On November 24, 2017, Plaintiff's counsel received a right to sue notice from the EEOC regarding Plaintiff's March EEOC Complaint. [Ex. D, p. 1].

275. Plaintiff has complied with all administrative prerequisites to bring this Complaint.

### COUNT I
### DEFAMATION PER SE/CONSPIRACY
### (Plaintiff Against Defendants Law and Walker)

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 22 of 33

276. Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully alleged herein.

277. As explained above, Defendant Law intentionally made false statements about Plaintiff.

278. As explained above, Defendant Law conspired with Defendant Walker to make these false statements about Plaintiff.

279. The false statements imputed that Plaintiff lacked the ability to perform in his profession.

280. Additionally, and/or alternatively, the false statements otherwise prejudiced Plaintiff in his profession.

281. Defendants Walker and Law had a duty not to defame or not to conspire to defame Plaintiff.

282. Notwithstanding this duty, Defendants Walker and Law defamed and/or conspired to defame Plaintiff and did so intentionally.

283. As a result of the defamatory statements, Plaintiff suffered damages including damage to his reputation, lost wages, and emotional distress.

22

284. The defamatory statements were the direct and proximate cause of Plaintiff's injuries described herein.

WHEREFORE, Plaintiff demands compensatory and punitive damages and costs from Defendant Walker and Defendant Law.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 23 of 33

### COUNT II
### TORTIOUS INTERFERENCE WITH AN ECONOMIC ADVANTAGE
### (Plaintiff Against Defendants Law and Walker)

285. Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully alleged herein.

286. As described above, Plaintiff had a legitimate expectation of continued employment with CP.

287. As described above, the Defendants conspired to interfere with Plaintiff's employment.

288. As described above, Defendants Walker and Law intentionally and unjustifiably interfered with Plaintiff's employment.

289. Further, and as described above, Plaintiff had a legitimate expectation of continued employment with Triton College.

290. As described above, Defendant Law intentionally and unjustifiably interfered with that employment.

291. As a result of the interference, Plaintiff suffered damages, including lost wages and emotional distress.

292. Defendants Walker's and Defendant Law's interference was the direct and proximate cause of Plaintiff's injuries described herein.

WHEREFORE, Plaintiff demands compensatory and punitive damages and costs from Defendant Walker and Defendant Law.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/CONSPIRACY
### (Plaintiff Against Defendants Law and Walker)

293. Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully alleged herein.

294. As described above, Defendant Law intentionally and knowingly made false statements about Plaintiff.

295. As described above, Defendant Law stated that Plaintiff was suicidal.

296. As described above, Defendant Walker conspired with Defendant Law to make these false statements about Plaintiff to discredit Plaintiff.

297. Additionally, and/or alternatively, Defendant Walker conspired with Defendant Law to make these false statements about Plaintiff to have Plaintiff terminated.

298. Defendant Walker's and Defendant Law's actions in making these false statements and allegations was extreme and outrageous.

299. In making these false statements to discredit Plaintiff or to have Plaintiff terminated, Defendants Walker and Law intended to cause Plaintiff extreme emotional distress.

300. Additionally, and/or alternatively, in making these false statements to discredit Plaintiff or to have Plaintiff terminated, Defendants Walker and Law acted with reckless disregard to the probability of causing Plaintiff extreme emotional distress.

301. As a result of Defendant Walker's and Defendant Law's actions, Plaintiff suffered severe and extreme emotional distress.

302. Plaintiff has suffered extreme humiliation and extreme emotional distress at being labeled as suicidal.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 24 of 33

24

303. Plaintiff has suffered extreme humiliation and extreme emotional distress at being placed on leave and then terminated as a result of these statements.

304. Specifically, Plaintiff has suffered grief, shame, humiliation, fear, anxiety, anger, stress, embarrassment, and humiliation as a result of Defendant Walker's and Defendant Law's actions.

305. Beginning on November 30, 2016 and as a result of Defendant Walker's and Defendant Law's actions, Plaintiff began seeking counseling.

306. Further, in January of 2017 and as a result of Defendant Walker's and Defendant Law's actions, Plaintiff was prescribed medication for insomnia, depression, and anxiety.

307. Defendant Walker's and Defendant Law's actions were the direct and proximate cause of Plaintiff's injuries described herein.

WHEREFORE, Plaintiff demands compensatory and punitive damages and costs from Defendant Walker and Defendant Law.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 25 of 33

## COUNT IV
### INVASION OF PRIVACY – FALSE LIGHT/CONSPIRACY
### (Plaintiff Against Defendants Law and Walker)

308. Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully alleged herein.

309. As described above, Defendant Law intentionally and knowingly made false statements about Plaintiff.

310. These false statements would be highly offensive to a reasonable person.

311. As described above, Defendant Walker conspired with Defendant Law to make these false statements about Plaintiff to discredit Plaintiff.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 26 of 33

312. Additionally, and/or alternatively, Defendant Walker conspired with Defendant Law to make these false statements about Plaintiff to have Plaintiff terminated.

313. As a result of Defendant Walker's and Defendant Law's actions, Plaintiff suffered severe and extreme emotional distress.

314. Plaintiff has suffered extreme humiliation and extreme emotional distress at being labeled as suicidal.

315. Plaintiff has suffered extreme humiliation and extreme emotional distress at being placed on leave and then terminated as a result of these statements.

316. Specifically, Plaintiff has suffered grief, shame, humiliation, fear, anxiety, anger, stress, embarrassment, and humiliation as a result of Defendant Walker's and Defendant Law's actions.

317. Beginning on November 30, 2016 and as a result of Defendant Walker's and Defendant Law's actions, Plaintiff began seeking counseling.

318. Further, in January of 2017 and as a result of Defendant Walker's and Defendant Law's actions, Plaintiff was prescribed medication for insomnia, depression, and anxiety.

319. Plaintiff was also terminated from CP as a result of Defendant Walker's and Defendant Law's actions, causing Plaintiff to suffer monetary damages.

320. Additionally, due to Defendant Law's actions in spreading these false allegations to Plaintiff's supervisors at Triton College, Plaintiff was further humiliated and terminated from that position.

321. Defendant Walker's and Defendant Law's actions were the direct and proximate cause of Plaintiff's injuries described herein.

WHEREFORE, Plaintiff demands compensatory and punitive damages and costs from Defendant Walker and Defendant Law.

**COUNT V**
**VIOLATION OF § 42 U.S.C. 1981 ON THE BASIS OF PLAINTIFF'S RACE**
**(Plaintiff Against Defendants Law and Walker)**

322. Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully alleged herein.

323. As described above and on the basis of his race, Defendants Law and Walker intentionally subjected Plaintiff to discrimination and retaliation that culminated in Plaintiff's termination from CP.

324. Further, as described above and on the basis of his race, Defendant Law intentionally subjected Plaintiff to discrimination and retaliation that culminated in Plaintiff's indefinite suspension from Triton College.

325. By undertaking these actions, the Defendants Law and Walker violated Plaintiff's rights pursuant to 42 USCS § 1981 on the basis of Plaintiff's race.

326. As a result of violation of Plaintiff's rights as guaranteed by 42 USCS § 1981, Plaintiff has suffered damages including, but not limited to, lost wages and mental stress, distress, and anguish.

327. Defendant Law's and Defendant Walker's actions were the direct and proximate cause of Plaintiff's injuries described herein.

WHEREFORE, Plaintiff demands compensatory and punitive damages and costs from Defendant Walker and Defendant Law.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 27 of 33

27

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 28 of 33

## COUNT VI
## RACE DISCRIMINATION PURSUANT TO TITLE VII
### (Plaintiff Against Defendant Canadian Pacific)

328. Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully alleged herein.

329. As stated above, on the basis of his race and at all relevant times, Plaintiff was a member of a protected class pursuant to Title VII.

330. As described above, Plaintiff was subjected to materially adverse employment actions including, but not limited to, assignment of menial and additional tasks, increased scrutiny and unfair discipline, lack of protections prior to be terminated, and termination.

331. Defendant CP, through its agents, took these materially adverse employment actions against Plaintiff.

332. As described above, Plaintiff was subjected to these materially adverse employment actions because of his race.

333. Defendant CP's conduct towards Plaintiff constitutes unlawful discrimination on the basis of Plaintiff's race under Title VII of the Civil Rights Act of 1964.

334. As a result of the discrimination, Plaintiff has suffered damages including, but not limited to, lost wages and mental stress, distress, and anguish.

335. Defendant CP's actions (taken through its agents) were the direct and proximate cause of Plaintiff's injuries described herein.

WHEREFORE, Plaintiff demands compensatory and punitive damages, attorney's fees, and costs from Defendant Canadian Pacific.

## COUNT VII
## RETALIATION ON THE BASIS OF RACE PURSUANT TO TITLE VII
## (Plaintiff Against Defendant Canadian Pacific)

336. Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully alleged herein.

337. As stated above, on the basis of his race and at all relevant times, Plaintiff was a member of a protected class pursuant to Title VII.

338. As described above, Plaintiff engaged in protected activity.

339. As described above and in retaliation for those protected activities, CP placed Plaintiff on leave, denied him procedural protections prior to termination, and terminated Plaintiff.

340. Defendant CP's conduct towards Plaintiff constitutes unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.

341. As a result of the discrimination, Plaintiff has suffered damages including, but not limited to, lost wages and mental stress, distress, and anguish.

342. Defendant CP's actions (taken through its agents) were the direct and proximate cause of Plaintiff's injuries described herein.

WHEREFORE, Plaintiff demands compensatory and punitive damages, attorney's fees, and costs from Defendant Canadian Pacific.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 29 of 33

## COUNT VIII
## DISCRIMINATION ON THE BASIS OF PERCEIVED DISABILITY
## PURSUANT TO THE ADA/ADAA
## (Plaintiff Against Defendant Canadian Pacific)

343. Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully alleged herein.

344. As stated above, CP perceived Plaintiff as disabled pursuant to the ADA/ADAA.

345. On the basis of that perceived disability, CP placed Plaintiff on leave and terminated Plaintiff.

346. When doing so, CP denied Plaintiff the procedural protections of the disciplinary process or the RTW Policy.

347. As stated above, upon information and belief, other similarly-situated persons who were not perceived as disabled were given those protections.

348. Placing Plaintiff on leave, terminating Plaintiff, and failing to give Plaintiff procedural protections constitutes discrimination on the basis of perceived disability.

349. As a result of this discrimination, Plaintiff has suffered damages, including, but not limited to, lost wages and mental stress, distress, and anguish.

350. Defendant CP's actions (taken through its agents) were the direct and proximate cause of Plaintiff's injuries described herein.

WHEREFORE, Plaintiff demands compensatory and punitive damages, attorney's fees, and costs from Defendant Canadian Pacific.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 30 of 33

## COUNT IX
## RETALIATION PURSUANT TO FMLA
### (Plaintiff Against Defendant Canadian Pacific)

351. Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully alleged herein.

352. As stated above, Plaintiff was terminated for attempting to take FMLA leave.

353. In terminating Plaintiff for attempting to take FMLA leave, Defendant CP, through its agents, retaliated against Plaintiff.

354. As a result of the retaliation, Plaintiff has suffered damages, including, but not limited to, loss of income, mental stress, anguish, and distress.

355. Defendant CP's actions, taken through its agents, were the direct and proximate cause of Plaintiff's injuries described herein.

WHEREFORE, Plaintiff demands compensatory and punitive damages, attorney's fees, and costs from Defendant Canadian Pacific.

## COUNT X
## BREACH OF CONTRACT
### (Plaintiff Against Defendant Canadian Pacific)

356. Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully alleged herein.

357. As stated above, the 2013 Policies and Procedures Manual constituted a contract between Plaintiff and Defendant CP.

358. Additionally, and/or alternatively, and as stated above, the Return to Work Policy constituted a contract between Plaintiff and CP.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 31 of 33

31

359. On information and belief, Defendant CP contends that Plaintiff refused to obey an order and was thus placed on leave and terminated.

360. Additionally, and/or alternatively, on information and belief, Defendant CP contends that Plaintiff was placed on leave and terminated for medical reasons.

361. Pursuant to these contracts and as explained above, Plaintiff was entitled to certain procedures before being terminated for a disciplinary infraction or for a medical reason.

362. As stated above, Plaintiff was not given the procedures to which he was due pursuant to the contracts before being terminated.

363. By placing Plaintiff on leave and subsequently terminating Plaintiff without the procedures outlined in the contracts, Defendant CP breached those contracts.

364. Further, and as explained above, pursuant to those contracts, Defendant CP was to keep information concerning the disciplinary infraction and/or the medical issue confidential.

365. Defendant CP, through its agents, breached those contracts by disclosing confidential and personal information to special agent Ben Pepich, special agent Jesus Ramos, and Plaintiff's supervisors at Triton College.

366. As a result of these breaches, Plaintiff has suffered damages including, but not limited to lost wages and mental stress, distress, and anguish.

367. Defendant CP's actions (taken through its agents) were the direct and proximate cause of Plaintiff's injuries described herein.

WHEREFORE, Plaintiff demands compensatory and punitive damages and costs from Defendant Canadian Pacific.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 32 of 33

## COUNT XI
## SUPPLEMENTAL CLAIM FOR *RESPONDEAT SUPERIOR*

368. Plaintiff hereby incorporates and re-alleges the above paragraphs as though fully alleged herein.

369. The acts of the individual Defendants, who violated state law, were committed within the scope of the individual Defendants' employment by Defendant Canadian Pacific.

370. Thus, Defendant Canadian Pacific, as the individual Defendants' principal, is liable for the actions of its agents under the doctrine of *respondeat superior*.

WHEREFORE, should the individual Defendants be found liable for any state law claims alleged herein, Plaintiff demands judgment against Defendant Canadian Pacific as well as any additional relief.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 33 of 33

Respectfully submitted,

**s/ Kara Amouyal, Esq.**
One of the attorneys for the Plaintiff

Kara Amouyal, Esq.
Blake Horwitz, Esq.
Firm No. 33057
**The Blake Horwitz Law Firm, LTD.**
111 W. Washington, Suite 1611
Chicago, Illinois 60602
Phone: (312) 676-2100
Fax: (312) 445-8741

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
CALENDAR: W
PAGE 1 of 14
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

# EXHIBIT A

# CANADIAN PACIFIC POLICE SERVICE

## Policy and Procedures Manual

## 2013

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 2 of 14



### PRIVATE & CONFIDENTIAL

This Policy and Procedures Manual is the property of Canadian Pacific Police Service and is for the use of Canadian Pacific Police Service employees only.

It must not be disseminated outside of the Service in anyway, in whole or in part without the express consent of the Chief of Police.

# Purpose

1.    The purpose of this Policy and Procedures Manual is to set forth the current policies and procedures of the Canadian Pacific Police Service (CPPS).   This Policy and Procedures manual shall take precedence over all previously broadcasted policies and procedures.

2.    The policies and procedures outlined in this Manual apply to all employees of the CPPS, unless otherwise stated.

3.    The Chief of Police, or designate, shall determine when a written directive is to be broadcast to the Service should an addition, deletion or enhancement be required to the Policy and Procedure Manual prior to the publication of a new manual.  All written directives will form part of the Policy and Procedures Manual.

4.    The CPPS Policy and Procedure Manual will not take precedence over and will be used in conjunction with all relevant Federal, Provincial, State and Municiple legislation, as well as, any applicable Collective Bargaining Agreement.

5.    It is the practice of the CPPS to establish and maintain a structured program of written policies, procedures and guidelines in order to provide all employees with the guidance necessary to ensure a high degree of service which is consistent with the mission of the Service and in support of Canadian Pacific's foundations.

6.    All employees are responsible for the compliance of applicable CPPS policies, procedures and guidelines.   Any employee who fails, willfully or neglegently, to comply, by act or omission, with a lawful order or policy, procedure or guideline shall be subject to disciplinary action.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 3 of 14

# Foreword from the Chief of Police

As a disciplined Police Service operating in multiple jurisdictions across an international border, the policy challenges faced by the Canadian Pacific Police Service (CPPS) are significant. At all times our policies must reflect the highest levels of professionalism, integrity and respect while at the same time encompassing the requirements of very diverse systems of criminal justice. The challenge for the CPPS is exacerbated by the nature of our relationship to the Canadian Pacific Railway and the need to constantly find a balance between our duty to our employer and our statutory duty to the public.

This policy and procedures manual is a statement of the principles that we will hold ourselves to, and a demonstration of our commitment to be professional police officers in everything we do. The manual is a living document and will evolve as legal requirements, our operating environment and our priorities change over time.

All members of the CPPS must take the time to study this manual, keep themselves aware of changes and refer to it often. This manual will be updated on an annual basis and any changes will be communicated to all staff as they are published.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 4 of 14

Ivan R. McClelland MBA, P.Mgr
Chief of Police

# Introduction

- Mission Statement of Canadian Pacific Police Service
- Organization of Canadian Pacific Police Service

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 5 of 14

iv

# Section 1: General Administration

**1.1    Information Management**

    1.1.1   Disclosure of Information

    1.1.2   Records Retention

    1.1.3   Recording and Playback of Police Control Centre Calls

    1.1.4   Use of Removable Media

    1.1.5   Retention of Electronic Devices

    1.1.6   Notebooks

    1.1.7   Case File Management

**1.2    Discipline**

    1.2.1   Code of Conduct

    1.2.2   Preventative Coaching and Mentoring

    1.2.3   Corrective Discipline

    1.2.4   Disciplinary Investigation System

    1.2.5   McNeil Disclosures (Canada)

**1.3    Business Travel**

    1.3.1   Authorization to Travel

**1.4    Expenses**

**1.5    Workplace Safety**

    1.5.1   Personal Protective Equipment

    1.5.2   Prevention of Communicable Diseases

    1.5.3   Workplace Accidents and Injuries

    1.5.4   Police Ride-Along

**1.6    CP Policies**

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 6 of 14

# Section 2: Administration and Support

**2.1** **Personnel Management**

    2.1.1 Recruitment

    2.1.2 Oath of Office/Certificate of Appointment

    2.1.3 Promotion

    2.1.4 Performance Evaluation - Union Members

    2.1.5 Employee Recognition

    2.1.6 Personal Appearance

    2.1.7 Employee Identification

**2.2** **Training and Professional Development**

    2.2.1 Training Strategy

    2.2.2 Training Requests

    2.2.3 Use of Force Training Strategy

    2.2.4 Firearms Training

**2.3** **Professional Standards**

    2.3.1 Policy Process

    2.3.2 Early Intervention System Administration

    **2.3.3 Public Complaint Administration**

        2.3.3.1 Public Complaints

    **2.3.4 Internal and Media Communications**

        2.3.4.1 Service Communications

        2.3.4.2 Media Relations

        2.3.4.3 Visual Identity

        2.3.4.4 Service Forms

    **2.3.5 Quality Assurance & Audits**

**2.4** **Asset & Cost Management**

    2.4.1 Property and Equipment Control

    2.4.2 Uniform and Equipment

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 7 of 14

# Section 3: Operations Management

**3.1    Agency Jurisdiction**

**3.2    Use of Force**

3.2.1   Use of Force Training Strategy

3.2.2   Use of Lethal Force

3.2.3   Physical Control Techniques

3.2.4   Use of Intermediate Weapons

3.2.5   Use of Force Reporting

**3.3    Firearms**

3.3.1   Firearms - General

3.3.2   Discharge of a Firearm

3.3.3   Inspection

3.3.4   Ammunition

3.3.5   Travel with a Firearm (Canada)

3.3.6   Travel with a Firearm (United States)

3.3.7   Firearms Inventory

3.3.8   Firearm Disposal (Canada)

3.3.9   Firearm Disposal (United States)

**3.4    Incident Management**

3.4.1   Response to Incidents

3.4.2   Response to Critical Incidents

3.4.2.1 Critical Incident Response Guideline

3.4.3   Incident Command System

3.4.3.1 Major Incident Mobilization Plan

3.4.4   Highway Rail Grade Crossing Incident

3.4.5   Federal Railroad Administration Reporting Requirements

**3.5    Investigations Management**

**3.5.1 Investigations**

3.5.1.1 Investigations

3.5.1.2 Canadian Pacific Employee Investigations

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 8 of 14

3.5.1.3 Constitutional Rights

3.5.1.4 Diplomatic Immunity

**3.5.2 Juvenile Offenders**

3.5.2.1 Juveniles in Custody

3.5.2.2 Youth Criminal Justice Procedures

3.5.2.3 Interview of Juveniles

**3.5.3 Warrantless Searches**

3.5.3.1 Warrantless Searches – General

3.5.3.2 Stopping, Questioning and Frisking (Canada)

3.5.3.3 Stopping, Questioning and Frisking (United States)

3.5.3.4 Weapons Search (Canada)

3.5.3.5 Vehicle Search (Canada)

3.5.3.6 Vehicle Search (United States)

**3.5.4 Arrests & Arrest Warrants**

3.5.4.1 Arrest Situations

3.5.4.2 Alternatives to Arrest (United States)

3.5.4.3 Alternatives to Arrest (Canada)

3.5.4.4 Transportation of Persons in Custody

3.5.4.5 Special Transportation Situations

3.5.4.6 Identification and Documentation

3.5.4.7 Prisoner Handover

3.5.4.8 Arrest Warrants

**3.5.5 Interviews**

3.5.5.1 Interview Rooms

3.5.5.2 Interviews – Canada

3.5.5.3 Interviews – United States

3.5.5.4 Audio Recording – General

3.5.5.5 Audio Recording – Procedures

**3.5.6 Evidence**

3.5.6.1 Search Warrants & Production Orders

3.5.6.2 Scenes of Crime and Identification Officers

3.5.6.3 Evidence Collection, Handling & Preservation

3.5.6.4 Photography & Video

3.5.6.5 Fingerprinting

3.5.6.6 Property & Evidence Packaging

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 9 of 14

3.5.6.7 Property and Evidence Submission

3.5.6.8 General Property & Evidence Control

3.5.6.9 Storage/Security of Property & Evidence

3.5.6.10 Release of Property & Evidence

3.5.6.11 Search and Seizure of Computer Equipment

3.5.6.12 Requests for Medical Records

### 3.6 Operational Management

3.6.1 Shift Briefing

3.6.2 Duty Rosters

3.6.3 Response to Labour Disputes

3.6.4 Special Event Planning

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 10 of 14

# Section 4: General Duties

**4.1** **General Duties**

4.1.1 Patrol Vehicles

4.1.2 Automated Vehicle Location System

4.1.3 Mobile Audio/Video Recording Equipment

4.1.4 Use of Electronic Devices

4.1.5 Responding to persons with suspected mental illness

4.1.6 Foreign Nationals

4.1.7 Victim and Witness Assistance

4.1.8 Maintenance of Traffic Tickets/Citations

4.1.9 Operational Inspections & Audits

4.1.10 Inspections and Audits of Property and Evidence

4.1.11 Railway Equipment Inspections

**4.2** **Traffic**

4.2.1 Traffic Control

4.2.2 Driver Contact

4.2.3 Speed Measuring Devices

4.2.4 Legislators/Foreign Diplomats

4.2.5 Impaired Operation Enforcement

4.2.6 Investigation of Impaired Operations

4.2.7 Breath Samples (Canada)

4.2. Field Sobriety or Coordination Test (United States)

4.2.9 Collision Investigation Reporting

4.2.10 Collision Scene Duties

4.2.11 Towing

4.2.12 Vehicle Pursuits

**4.3** **Public Safety**

4.3.1 No Trespassing Signs – Placement

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 11 of 14

X

# Section 5: Specialist Operations

**5.1**    **Police Control Centre**

    5.1.1  Radio and Cellular Communication (10 Codes)

    5.1.2  Canadian Police Information Centre (CPIC) Access

    5.1.3  Line of Duty – Serious Injury or Death Notification and Assistance

**5.2**    **Criminal Intelligence and Investigations Unit**

    5.2.1  Criminal Intelligence and Invesigation Unit - General

    5.2.2  Classification and Dissemination of Information

    5.2.3  Criminal Intelligence Bulletins

    5.2.4  Surveillance

    5.2.5  Undercover and Decoy Operations

    5.2.6  Joint Force Operation

    5.2.7  Significant Security Incident Reporting

    **5.2.8  Confidential Sources**

        5.2.8.1 Types of sources and use guidelines

        5.2.8.2 Developing and Handling Sources

        5.2.8.3 Source Records

        5.2.8.4 Source Rewards

    **5.2.9  Illegal Drugs and Organized Crime**

        5.2.9.1 Illegal Drugs and Organized Crime - Complaint Management

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 12 of 14

# CANADIAN PACIFIC POLICE SERVICE

# Mission Statement of Canadian Pacific Police Service

### Mission Statement

The mission of the Canadian Pacific Police Service is to assist Canadian Pacific to become the safest and most reliable railway in North America by:

- Enhancing Public Safety
- Supporting service reliability by reducing train delays
- Protecting railway personnel, assets, operations and information
- Enforcing the law and bringing offenders to justice.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 13 of 14

# CANADIAN PACIFIC POLICE SERVICE

## Organization and Administration

**Scope**: All Canadian Pacific Police Service Employees

### Policy Statement

Canadian Pacific Police Service will provide to all employees:

- Organizational charts to be displayed for all employees; and
- Notification of any organizational or administrative changes taking place, including effective dates;

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 14 of 14

**Related Procedures**

Organization and Administration

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
CALENDAR: W
PAGE 1 of 21
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

# EXHIBIT B

# CANADIAN PACIFIC POLICE SERVICE

## 1.2 Discipline

**Scope:** All Canadian Pacific Police Service Employees

### Policy Statement

It is a statutory requirement that the Canadian Pacific Police Service (CPPS) has a robust and effective discipline system that complies with the requirements of the jurisdictions in which we operate. The Service will ensure that all disclosure and disciplinary requirements are met in regards to the *R. v. McNeil* decision.

All employees of the CPPS will:

- Ensure they are aware of, and comply with the provisions of the CPPS Code of Conduct;
- Maintain a working knowledge of and comply with the requirements of all CPPS Policies and Procedures.

Managers and Supervisors will ensure:

- That disciplinary matters are dealt with expeditiously and confidentially and in accordance with CPPS disciplinary procedures;
- That serious disciplinary breaches are reported to CPPS Professional Standards as soon as practicable;
- That members, who may be the subject of disciplinary investigations or sanctions, are treated fairly and with respect at all times and that confidentiality is respected at all times;
- That the provisions of any applicable Collective Agreement are respected.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 2 of 21

| Related Procedures |
| --- |
| 1.2.1 Code of Conduct |
| 1.2.2 Preventative Coaching and Mentoring |
| 1.2.3 Corrective Disciplinary |
| 1.2.4 Disciplinary Investigation System |
| 1.2.5 McNeil Disclosures (Canada) |

# CANADIAN PACIFIC
# POLICE SERVICE

| **Procedure Title** | 1.2.1 Code of Conduct |
|---|---|
| **Related Policy** | 1.2 Discipline |

## Policy Statement

It must be the duty of all members of the Canadian Pacific Police Service to protect the public, keep the peace and uphold the law at all times. In discharging their duties, members must act with integrity, exercise good judgment and uphold and protect the individual rights of all persons. Members of the CPPS will always act with self-discipline and will treat all persons in a courteous, professional and unbiased manner. Members will strive to be community leaders and role models by maintaining a high degree of professionalism in all actions and in their appearance.

The Code of Conduct does not supersede, circumvent or replace any law, act or other lawful order.

The terms of this Code of Conduct shall be applied consistently with any applicable Collective Bargaining Agreement.

## Misconduct:

The examples provided in this written directive are provided as a guideline and are by no means exhaustive.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 3 of 21

## 1. Disorderly or Inappropriate Conduct

A member who commits misconduct and is liable to disciplinary action if they engage in any of the following:

a. Acting in a disorderly or inappropriate manner, or in a manner prejudicial to discipline or likely to bring discredit upon the reputation of the Service, or upon the reputation of law enforcement.

b. Differentially applying the law or exercising their authority on the basis of race, colour, religion, physical disability, marital status, age, ancestry or place of origin. Using profane, abusive or insulting language towards any person.

c. Is guilty of oppressive or tyrannical conduct towards a subordinate.

**PRIVATE & CONFIDENTIAL**                                                                                         Page 1 of 6

# CANADIAN PACIFIC
# POLICE SERVICE

d. Willfully or negligently withholding or suppressing information, complaints or records about any member of the service, or another member of a law enforcement agency.

e. Willfully or negligently making any false complaint against any member of a law enforcement agency.

f. Withholding or suppressing a complaint or report against a member of the Service.

g. Having been found guilty of an offence under any Provincial, State or Federal legislation, or failing to report being charged with a criminal offence.

h. Willfully or negligently fails to comply with the terms and conditions of the authorization of the member's appointment.

i. Contravenes any provision of any legislation or written directive of the Service.

j. Acts in a disorderly manner or in a manner prejudicial to discipline likely to bring discredit upon the reputation of the Service.

k. Abetting in or knowingly being an accessory to misconduct, as described in the policies of the Service.

l. Engaging in or conveying malicious or unfounded gossip detrimental to other members, company employees, the Service or the Company.

m. Associating with or has dealings with persons who the member knows or ought to know are under criminal investigation or who are known to have a criminal or immoral reputation in the community, except as necessary or justified in performance of duty, or if the said person is an immediate family member.

n. Without lawful excuse, is interfering, in any manner, with cases being investigated by other members, other law enforcement agencies , Canadian Pacific departments, or government agencies.

o. Participating in the management, affairs or political campaign of any candidate for political office during work hours.

p. Soliciting any assessments, contributions or services for any political party during work hours.

q. Using their official authority, appointment or influence for the purposes of interfering with or affecting the results of an election or nomination for office.

r. In their capacity as members of the service authorizing the use of any photograph(s) of themselves in connection with any testimonial, advertisement or political campaign.

s. In their capacity as members of the service endorsing or subscribing to any testimonial, advertisement or political campaign.

ELECTRONICALLY FILED 2/21/2018 10:28 AM 2017-L-011381 PAGE 4 of 21

# CANADIAN PACIFIC
# POLICE SERVICE

t.   Authorizing reference to their official title, rank or membership in the service in connection with any testimonial, advertisement or political campaign.

u.   Engaging in workplace harassment contrary to CPR Policy.

v.   Being improperly dressed, dirty or untidy in person, clothing or equipment while on duty.

**2.   Insubordination**, which includes, but is not limited to:

a.   Insubordination by word, or action.

b.   Without lawful excuse disobeying, omitting or neglecting to carry out any lawful order, directive or policy of the Service.

**3.   Neglect of Duty**, which includes, but is not limited to:



ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 5 of 21

a.   Without lawful excuse, neglecting or omitting promptly and diligently to perform the duties and responsibilities of a law enforcement officer, as appointed.

b.   Failing to work in accordance with orders, or leaving an area or other place of duty without due permission or sufficient cause.

c.   Failing to render assistance to any person requiring assistance, within the capabilities and authorities of the member's appointment.

d.   By carelessness or neglect, permitting a prisoner to escape.

e.   Failing to report a matter that is a member's duty to report.

f.   Omitting to make necessary entries in a book or record.

g.   Exaggerating sickness or injury to evade duty.

h.   Being absent without leave or being late for any duty without reasonable excuse.

**4.   Deceit**, which includes, but is not limited to:

a.   Knowingly making or signing false or misleading statements in any report or record.

b.   Willfully or negligently making false, misleading or inaccurate statements pertaining to their duties.

c.   Without lawful excuse destroying or mutilating records or property, or altering or erasing an entry in a record.

d.   Using the Services assets for unauthorized purposes.

**5.   Breach of Confidence**, which includes, but is not limited to:

---

**PRIVATE & CONFIDENTIAL**                                    Page 3 of 6

# CANADIAN PACIFIC
# POLICE SERVICE

a. Failing to maintain confidentiality, when it must be maintained.

b. Divulging any information that is in their duty to keep secret.

c. Giving notice directly or indirectly to any person against whom any warrant or summons has been issued except in the lawful execution of the warrant or summons.

d. Without proper authority communicating to the media or to any unauthorized person regarding matters relating to the Service.

e. Without proper authority, showing to any person, that is not a member of the Service or any unauthorized member of the Service, any record or document that is the property of the Service.

f. Offering or taking bribes or failing to report a bribe attempt.

g. Failing to account for, or to make a prompt true return of money or property received in the performance of duties.

h. Directly or indirectly soliciting or receives a gratuity or present, without the consent of the Chief, or designate.

i. Improperly using their position, as a member of the Service, for their own private advantage or for the advantage of another person.

j. Violates in any way the CP's Code of Business Ethics.

**Conflict of Interest,** which includes, but is not limited to:

a. Offering themselves for secondary employment as a private investigator, security guard or similar position which could reasonably be determined to cause a conflict of interest as a member of a law enforcement agency.

b. Being an owner, manager or paid advisor to a private investigator or security guard agency, or similar position which could reasonably be determined to cause a conflict of interest as a member of a law enforcement agency.

c. Engaging in activities that may, or will, result in a conflict of interest or an apprehension of, or lack of integrity to the Service or other law enforcement agencies.

7. **Unlawful, Unnecessary Exercise of Authority or Exceeding Authority,** which includes, but is not limited to:

a. Exercising their authority as a member of a law enforcement agency when it is unlawful or unnecessary to do so.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 6 of 21

---

**PRIVATE & CONFIDENTIAL**

# CANADIAN PACIFIC
# POLICE SERVICE

b. Failing to comply with the terms and conditions of the Service's Authorization to employ members.

c. Failing to comply with the terms and conditions of a member's issued appointment.

d. Failing to comply with the Service's Code of Conduct.

e. Without good or sufficient cause making an unlawful or unnecessary arrest.

f. Using any unnecessary force against a prisoner or other person in the performance of their duties.

**8. Consuming Alcohol or Drugs in a Manner Prejudicial to Duty** which includes but is not limited to:

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 7 of 21

a. The consumption of alcohol, unless being in the performance of their duties, and prior consent has been provided by the Chief of Police, or designate.

b. Possession of controlled drugs and controlled substances, which possession is prohibited by law, unless being in the performance of their duties.

c. Reporting for or being on duty while being unfit for duty through the consumption of alcohol, drugs and/or controlled substances, as listed under the Controlled Drugs and Substance Act.

**Inappropriate Use of Force,** which includes but is not limited to:

a. Applying force beyond that necessary to achieve control of a situation.

b. Using restraining devices where inappropriate.

**10. Improper Use of Firearms, Other Weapons or Restraining Devices**, which includes but is not limited to:

a. Having, using or carrying any weapon other than authorized by the Service.

b. Having discharged a firearm, when on duty, other than when on a firearm training exercise, but including accidentally at any time, failing to report such incidents to a supervisor, as soon as practical thereafter.

c. Failing to exercise sound judgment and restraint in respect of the use and care of a firearm, other weapon or a restraining device.

d. Using firearms, other weapons or restraining devices other than as prescribed by relevant policies.

---

# CANADIAN PACIFIC POLICE SERVICE

11. **Damage to Clothing or Equipment**, which includes but is not limited to:

   **Attire:**
   a. Willfully or carelessly causing loss or damage to any article of clothing or equipment or any record or other property of the Service.
   b. Failing to report loss or damage, however caused, as soon as practicable.

   **Vehicle:**
   c. Failing to keep vehicles and equipment clean and in good working order, in accordance with the Services policies.
   d. Failing to report loss or damage however caused as soon as practicable.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 8 of 21

# CANADIAN PACIFIC
# POLICE SERVICE

| **Procedure Title** | 1.2.2  Preventative Coaching and Mentoring |
|---|---|
| **Related Policy** | 1.2  Discipline |

The Canadian Pacific Police Service advocates preventative coaching and mentoring for all members of the Service. Preventive coaching and mentoring is the practice of providing training and guidance that promotes doing things the right way while adhering to accepted codes of behaviour rather than through fear of punishment.

To create an environment for preventative coaching and mentoring, the service and supervisors shall:

a.  Ensure members are provided the training necessary to perform their duties and all training is documented;

b.  Ensure members know what is expected of them and foster a cooperative team approach to duties;

c.  Provide consistent direction to all members;

d.  Maximize the use of informal coaching;

e.  Review written policy and procedures with members to effectively clarify any misinterpretation.

Supervisors may need to take formal action and address any concerns through corrective discipline if a member fails to adjust or respond appropriately to preventative coaching and mentoring. All corrective discipline shall be done pursuant to the applicable corrective discipline policies and procedures.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 9 of 21

# CANADIAN PACIFIC
# POLICE SERVICE

| **Procedure Title** | 1.2.3 Corrective Discipline |
|---|---|
| **Related Policy** | 1.2 Discipline |

Corrective discipline refers to the practice of providing verbal counseling, coaching and through counseling and corrective action sessions with members who fail to adjust or respond appropriately to preventative coaching and monitoring or exhibit behaviours that are consistent with minor breaches of the Code of Conduct and Personal Appearance and/or Uniforms and Equipment policies. The minor breach in conduct must result from unawareness of what is required and lack an element of neglect or intent. Practiced effectively and consistently corrective discipline can put members back on the right track. The following corrective discipline will be used by supervisors:

a.  Verbal counseling

b.  Coaching

c.  Counseling and Corrective Action Session

## Corrective Discipline Guidelines

In applying corrective discipline, the service and supervisors shall:

a.  Ensure all identified unacceptable behaviour, performance or misconduct is handled promptly, consistently and impartially;

b.  Provide members with a clear understanding of the expected behaviour and the consequences of the failure to perform pursuant to CPPS policies and procedures;

c.  Ensure that any behavior that contravenes any policy is unacceptable and is identified to the member as soon as practicable;

d.  Ensure that any verbal counseling, coaching and/or Counseling and Corrective Action Sessions are formally documented on form DISP-01;

e.  Ensure that the DISP-01 is provided to the Police Professional Standards Department (PSD) and the District Inspector upon completion of each step with applicable signatures;

f.  Ensure that all follow ups have been fully documented on DISP-01;

g.  Ensure that serious misconduct that is not to be handled through corrective discipline is referred to the District Inspector for handling through the Disciplinary Investigation Process and relevant procedures.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 10 of 21

**PRIVATE & CONFIDENTIAL** Page 1 of 4

# CANADIAN PACIFIC
# POLICE SERVICE

**2. Verbal Counseling Process**

Verbal counseling involves a supervisor meeting with a member in private to provide verbal guidance to improve a member's behavior, conduct or performance. Upon the completion of any verbal counseling, the supervisor is responsible to complete DISP-01 (with applicable signatures) and provide a copy of the completed DISP-01 to PSD and to the District Inspector.

**3. Coaching Process**

Coaching involves a supervisor meeting with a member in private to provide verbal guidance to improve a member's behavior, conduct or performance. A supervisor will arrange for remedial training and/or mentoring for the member to effect the desired change in behavior, conduct or performance. Upon the completion of any coaching, the supervisor is responsible to complete DISP-01 (with applicable signatures) and provide a copy of the completed forms to PSD and to the District Inspector.

**4. Counseling and Corrective Action Session Process**

A Counseling and Corrective Action Session involves meeting with the member in private and documenting the member's behavior, conduct and/or performance, identifying expected behavior, conduct and/or performance changes as well as to develop an action plan.

The following process will be used for all counseling and corrective action sessions:

a. Before the initial meeting, the supervisor will:

    i. Prepare DISP-01 and the supporting documentation;

    ii. Review the supporting documentation and DISP-01 with the District Inspector (if applicable);

    iii. Schedule the initial meeting with the member.

b. During the initial meeting:

    i. The supervisor will provide the member with a copy of DISP-01 and any other supporting documentation;

    ii. The supervisor will review the member's behavior, conduct and/or performance that is of a concern and advise the member of the appropriate behavior, conduct and/or performance;

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 11 of 21

# CANADIAN PACIFIC
# POLICE SERVICE

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 12 of 21

ii. The supervisor will review, with the member, the corrective actions to be taken and advise the member that if the corrective actions are not met what the consequence for non-compliance will be;

iii. The supervisor will, if applicable, develop an action plan with agreed timelines for review;

iv. The member will provide their comments on DISP-01 and their signature confirming that they have reviewed the proposed action plan;

v. The supervisor will review the form and sign DISP-01;

vi. The supervisor will provide a copy of the completed DISP-01 to:

  a. Member

  b. Police Professional Standards Department

  c. District Inspector

c. Following the initial meeting, the supervisor will:

 i. Follow up on the action plan, pursuant to the agreed timelines;

 ii. Complete the follow up section on DISP-01;

 iii. Provide a copy of DISP-01 with the follow up section completed to:

  a. Member

  b. Police Professional Standards Department

  c. District Inspector

d. Upon completion of the action plan, the supervisor will:

 i. Complete the final report section on DISP-01.

 ii. Provide a copy of DISP-01 to:

  a. Member

  b. Police Professional Standards Department

  c. District Inspector

## 5. Records

Any corrective discipline incidents that have not proceeded to the disciplinary investigation process shall be removed from a member's personnel record 12 full calendar months after the date the final report section being completed by the supervisor.

# CANADIAN PACIFIC
# POLICE SERVICE

Any corrective discipline incidents that have not proceeded to the disciplinary investigation process, of which there are two or more incidents of the same nature, shall only be removed from a member's personnel record only upon 12 full calendar months after date the final report section has been completed by the supervisor on the last corrective discipline incident.

Any corrective discipline which has proceeded to the disciplinary investigation process shall form part those records and will be maintained on the member's personnel file pursuant to the disciplinary investigation procedures.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 13 of 21

# CANADIAN PACIFIC
# POLICE SERVICE

| Procedure Title | 1.2.4  Disciplinary Investigation System |
|---|---|
| Related Policy | 1.2  Discipline |

The disciplinary investigation process is the practice of conducting a hearing to review the facts of an incident that will result in a judgment. The hearing is presided over by a senior officer acting as a hearings officer.

In conducting the disciplinary investigation process the hearings officer shall ensure that if a member involved is represented by a bargaining agent the formal or informal disciplinary investigation is conducted in accordance with the rules set out in their respective Collective Bargaining Agreements.

**Informal Investigation Process**

If a member's behavior or misconduct is minor in nature and they are not represented by a bargaining agent, or the Collective Bargaining Agreement does not state an informal discipline procedure and punitive discipline for the infraction would be no greater than a reprimand, the following procedures may apply:

a.  The Deputy Chief of Operations deems it appropriate to deal with the matter through the informal process;

b.  Subject to the written agreement of the member involved, a senior officer or designate reviews the matter in an informal hearing. The hearing may take place in person or over the phone;

c.  The senior officer or designate makes a finding of fact, and, if the matter is substantiated, recommends punitive discipline to the Deputy Chief of Operations;

d.  The Deputy Chief of Operations reviews the findings and recommendation and, upon his agreement, the Deputy Chief of Operations will provide the member involved with a written decision.

In all cases the Senior Officer will be impartial, objective and unprejudiced.

Member failing to adjust or respond appropriately to punitive measures will continue to be dealt with through corrective discipline procedures.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 14 of 21

# CANADIAN PACIFIC
# POLICE SERVICE

**2.** **Formal Investigation Process**

If a member is **not** represented by a bargaining agent or the Collective Bargaining Agreement does not specify a formal disciplinary investigation the following procedure will apply:

a.   Members who are required to attend a disciplinary investigation will be given seven business days' notice;

b.   The notice will be in writing and contain the time, date, place and subject matter of the hearing;

c.   If the member is suspended from duty awaiting a disciplinary investigation they will be notified in writing of the reason for the suspension;

d.   If the member is suspended from duty the hearing will take place as soon as practicable following the event(s) in question;

e.   The hearing will be presided over by a senior officer acting as a hearings officer, the proceedings will be recorded in writing or with use of audio equipment;

f.   The member will be provided with copies of any documentation presented at the hearing and will be present during examination of any witness whose testimony may have a bearing on their responsibility and may offer rebuttal evidence thereto;

g.   The member is required to answer any questions put to them by the Hearings Officer relating to the event;

h.   The member may give evidence to refute any allegations or offer additional explanation relating to the event;

i.   The member will be given an opportunity to review the transcript of the hearing prior to signing it and will be provided a copy;

j.   A copy of the hearing report will then be forwarded to the applicable Deputy Chief of Operations;

k.   The Deputy Chief of Operations will then have ten days to review and make a determination.

The Deputy Chief of Operations may find as follows:

a.   That the matter is unfounded;

b.   That the matter, although substantiated, lacked the knowledge, neglect or intent required to find fault and should be referred back to the Supervisor for additional training, coaching and/or counseling pursuant to the corrective discipline procedure;

c.   That the matter is substantiated and recommend punitive discipline in the form of:

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 15 of 21

# CANADIAN PACIFIC
# POLICE SERVICE

        i.     Caution

        ii.    Warning

        iii.   Reprimand

        iv.   Severe reprimand

        v.    Suspension

        vi.   Reduction in rank grade

        vii.  Dismissal

d.    The Deputy Chief of Operations will provide written notice in the form of an email to the member outlining their findings and any action to be taken in terms of punitive discipline if appropriate.

In all cases the Hearings Officer will be impartial, objective and unprejudiced.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 16 of 21

## 3.  Appeal

### 3.1   Formal Discipline Process

a.    If a member represented by a bargaining agent claims that they have been unjustly dealt with in the circumstances defined by their respective Collective Agreement, may submit a grievance in accordance with the Collective Agreement. All appeals will be conducted in accordance with the rules set out in the respective Collective Bargaining Agreement.

b.    If a member is not represented by a bargaining agent then the member can appeal to the Chief of Police by sending an email within seven business days of receipt of the hearing officer's decision. The email will outline the reasons why the member feels the corrective action is excessive or undeserved. The Chief of Police will then respond to the member in writing giving his final decision within ten business days.

### 3.2   Informal Discipline Process

There is no right of appeal on the informal process.

## 4.  Dismissal Procedures

If misconduct results in a dismissal the member will be provided with written documentation from HR/LR that outlines:

# CANADIAN PACIFIC
# POLICE SERVICE

a.   The reason for the dismissal;

b.   The effective date of the dismissal;

c.   A statement from Canadian Pacific Human Resources Department in regards to the status of any benefits after dismissal and others option available to dismissed employees.

**5.   Role of Professional Standards**

a.   The Professional Standards Department will have oversight of the disciplinary investigation process and must be advised once the decision to progress to formal or informal discipline has been made.

b.   Professional Standards Department will ensure that timelines are being adhered to during the disciplinary investigation process.

c.   Professional Standards are responsible for the safeguarding and record keeping of all confidential documentation completed during the course of the discipline process.

**Discipline Records**

Upon initiating any disciplinary investigation process the Deputy Chief of Operations involved will ensure that Police Professional Standards Department is informed and will in addition send information pertaining to the investigation to the Manager of the Police Professional Standards Department.

**7.   Storage of Records**

Any documents or records of disciplinary matters involving members of the Service will be stored in a secure file cabinet or in secure electronic file on the police server. Access will be restricted to Police Professional Standards Department members, or as authorized by the Chief of Police. When a disciplinary investigation has been concluded, a copy of the discipline records will be placed on the member's personal file and hard copy records will be forwarded to Police Professional Standards for filing by secure mail.

**8.   Retention of Disciplinary Investigation Records**

If a disciplinary investigation process resulted in formal discipline, the records directly related to the discipline will be maintained in the member's personnel file for a period of five (5) years from the date in which the Deputy Chief of Operations' determination was made.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011351
PAGE 17 of 21

# CANADIAN PACIFIC
# POLICE SERVICE

If a disciplinary investigation process resulted in informal discipline, the records directly related to the discipline will be maintained in the member's personnel file for a period of three (3) years from the date in which the senior officers' determination was made.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 18 of 21

# CANADIAN PACIFIC
# POLICE SERVICE

| Procedure Title | 1.2.5  McNeil Disclosures (Canada) |
|---|---|
| Related Policy | 1.2  Discipline |

**1.    McNeil Disclosure Guidelines**

a.    All members will be required to complete a confidential Member Disclosure Form MCNEIL-01 and submit it in confidence to the Police Professional Standards Department (PSD) to develop an organizational baseline for McNeil Disclosures.

b.    A member is responsible to notify PSD immediately if a Report to Crown Counsel (RCC) has been received by any outside agency.

c.    All members will place priority on the submission of McNeil Disclosure Packages for in-custody RCCs over out-of-custody RCCs, and for serious and time-sensitive investigations and prosecutions.  Submission of McNeil Disclosure Packages is to be well before any hearing date.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 19 of 21

**Member's Responsibilities**

a.    Upon the instructions of PSD a member will complete and sign a MCNEIL-01.  The member will, as soon as practicable submit the MCNEIL-01 to PSD.

b.    By completing MCNEIL-01, the member will disclose whether or not the member has a "conduct record" that is required to be disclosed to Crown Counsel.  A "conduct record" means the member:

i.    Has been convicted or found guilty under the Criminal Code of Canada or the Controlled Drugs and Substances Act for which a pardon has not been granted, or is unsure of that fact;

ii.    Is currently charged with an offence under the Criminal Code of Canada or the Controlled Drugs and Substances Act, or is unsure of that fact;

iii.    Within the past five (5) years, has been convicted or found guilty of an offence, pursuant to any other federal or provincial statute, or is unsure of that fact;

     *NOTE:  Being found guilty of police misconduct under the RCMP Act or another provincial police act is to be reported.*

     *NOTE:  Members will not disclose to Crown convictions under the Motor Vehicle Act, unless it is relevant to the charge at hand (i.e. going to court where Crown is*

---

**PRIVATE & CONFIDENTIAL**                                                       Page 1 of 3

# CANADIAN PACIFIC POLICE SERVICE

      prosecuting a Hit & Run where the member has a conviction of Hit & Run that is less than 5 years).

    iv.    Within the past five (5) years, have been found guilty misconduct pursuant to the CPPS internal Discipline Investigation Process, or is unsure of that fact; or

    v.    Is currently the subject of an ongoing investigation pursuant to the CPPS internal Discipline Investigation Process, or is unsure of that fact.

c.    If requested by PSD, all members who have indicated on the MCNEIL-01 to the existence of a potential conduct record must complete MCNEIL-02.

## 3. On-going Disclosure Requirement

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 20 of 21

a.    The Crown's obligation to disclose is on-going and, in fact, survives the trial. The CPPS is responsible for ensuring that Crown Counsel is provided with up-to-date information regarding the member's conduct records from the time of the submission of the RCC prior to trial, and if the accused is convicted or pleads guilty, until the expiration of the appeal period after the trial and/or sentencing.

b.    A member who becomes the subject of proceedings captured by MCNEIL-01, after submission of the initial Report to Crown Counsel by PSD will promptly complete and submit an updated MCNEIL-01 and MCNEIL-02 to PSD for subsequent submission.

c.    If member's involvement in an investigation changes, the member will consult Crown Counsel as the disclosure requirements of the disciplinary record may also have changed.

## 4. Police Professional Standards Department Responsibilities

PSD will review the MCNEIL-01's to be submitted with the RCC, and:

a.    If all the members involved in an investigation with respect to the RCC indicate "No Record" on MCNEIL-01, PSD will complete MCNEIL-03 - Police Officers Witness Disclosure Summary and forward it with the RCC to Crown Counsel. PSD will retain all MCNEIL-01s in a secure location.

b.    If any member involved in an investigation with respect to the RCC indicates a "Conduct Record" on MCNEIL-01, PSD will forward to Crown Counsel the following documents with the RCC:

    i.    The original MCNEIL-01, if "Conduct Record" indicated;

# CANADIAN PACIFIC
# POLICE SERVICE

        ii.     Where possible, the completed MCNEIL-02, if already provided by the member who indicates a "Conduct Record"; and

        iii.    The completed MCNEIL-03.

c.    For in-custody or time sensitive RCCs, PSD will:

        i.      Forward only the RCC, MCNEIL-03 and MCNEIL-01 to Crown Counsel, if any members indicate that they have a "Conduct Record" on MCNEIL-01. PSD will forward the MCNEIL-02 once completed and received from the member, as soon as practicable thereafter. Where timing is critical, PSD may forward the RCC only and advise Crown Counsel that all McNeil disclosure information will follow as soon as practicable thereafter;

        ii.     Forward the RCC and completed MCNEIL-03 to Crown Counsel if all members indicated that they have "No Record" on their respective form MCNEIL-01;

d.    PSD will promptly forward to Crown Counsel all updated MCNEIL-01s and form MCNEIL-02s received from members.

e.    PSD will place all McNeil related forms and McNeil Disclosure Packages in a sealed envelope marked, **"CONFIDENTIAL – FOR CROWN COUNSEL USE ONLY"** when submitting to Crown Counsel.

f.    PSD will ensure that all MCNEIL-01 and MCNEIL-02 forms received are kept in a secure area, only accessible by PSD members or other persons as authorized by the Chief of Police.

g.    PSD will review all initial and updated MCNEIL-01 received from members.

h.    PSD will respond to requests from Crown Counsel for consultation in assessing "serious misconduct" or "relevance" of a member's conduct records for McNeil disclosure.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 21 of 21

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
CALENDAR: W
PAGE 1 of 48
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

# EXHIBIT C



ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 2 of 48

# <u>Return to Work Policy</u>

**Effective on:
March 1, 2010**

**Last Revised on:
November 1, 2010**

 CANADIAN
PACIFIC

Return to Work Policy

# Table of Contents

**1.0 Scope**.................................................................................. **3**

**2.0 Purpose** .............................................................................. **3**

**3.0 Definitions** .......................................................................... **4**

**4.0 Policy Statement**.................................................................**9**

**5.0 Roles and Responsibilities**................................................**12**

**6.0 Return To Work Process** ................................................... **19**

**7.0 Administration**.................................................................. **24**

**8.0 Related Documents/Resources**.......................................... **24**

**9.0 Appendices**........................................................................**26**

# APPENDICES

**A:**  **TREATING PHYSICIAN LETTER - SCP**
 **TREATING PHYSICIAN LETTER - SSP & NSSP**

**B:**  **JOB DEMANDS ANALYSIS TEMPLATE**

**C:**  **FUNCTIONAL ABILITIES FORM –SAFETY CRITICAL POSITIONS (SCP)**
 **FUNCTIONAL ABILITIES FORM –SAFETY SENSITIVE POSITIONS**
 **& NON-SAFETY SENSITIVE POSITIONS (SSP/NSSP)**

**D:**  **FITNESS TO WORK ASSESSMENT FORM**

**E:**  **RETURN TO WORK PLAN**

**F:**  **EMPLOYEE RETURN TO WORK ORIENTATION & ACKNOWLEDGEMENT**

**G:**  **RETURN TO WORK PROGRAM PAMPHLET**

**H:**  **CORE RETURN TO WORK COMMITTEE: TERMS OF REFERENCE**

**I:**  **LOCAL RETURN TO WORK COMMITTEES: TERMS OF REFERENCE**

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 3 of 48


CANADIAN
PACIFIC

Return to Work Policy

## 1.0 Scope

This policy applies to all occupational and non occupational injuries and illnesses affecting all Canadian Pacific (CP) non-union and union employees in Canada.

The principles and processes detailed in the Workplace Accommodation Policy (1501) will guide the treatment of all cases that fall under this policy.

## 2.0 Purpose

CP, (the Company) is committed to protecting the health and wellbeing of our employees. The objective of the Return To Work (RTW) program is to provide a caring and consistent process through which CP will support all employees who incur a disabling injury or illness in a successful timely reintegration to their regular positions in conjunction with their recovery to optimal functioning.

CP recognizes the value of each employee and the important contribution work is in an individual's life. Remaining involved in work and using current capabilities is important in an individual's recovery. The RTW program therefore provides for the timely provision of modified duties and work assignments where feasible. Modified duties and plans for reintegration into full duties are to be based on functional abilities information provided by a treating health care professional.

This policy is intended to achieve an effective return to work by:

- Assisting employees in maintaining their dignity and self-respect subsequent to being adversely affected by an injury or illness.
- Ensuring the well-being of affected employees and, by doing so, reducing stresses associated with: adjusting to a disability, reintegration to the workplace, financial complications, and other factors that adversely affect the employee.
- Early intervention, resulting in timely and safe return to work of employees, thereby minimizing the economic and emotional impact on employees and their families.
- Establishing and promoting good communication between all parties, respecting the need to protect confidential information.
- Reducing direct and indirect costs associated with occupational and non-occupational injuries and illnesses.
- Complying with current statutory requirements (Canadian Human Rights Act, Canada Labour Code, Provincial Workers' Compensation Acts and current rulings).

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 4 of 48



CANADIAN
PACIFIC

Return to Work Policy

# 3.0 Definitions

### Accommodation

Accommodation is the process of facilitating the return to productive work of an employee with medical limitations and/or restrictions that may be physical or psychological in nature, through various means with productive, meaningful employment. These might include reassignment or adjusting the work environment (e.g. workstation, equipment, process, duties and hours).

### Core Return To Work Committee (CRTWC)

A senior advisory committee of representatives from each Union and the Company providing a forum for senior union representatives to provide recommendations and feedback to the Company regarding the Company's Return to Work Program and policy.

### Critical Incident Response Program (CIRP)

Canadian Pacific Railway regards employee safety as a priority and fully recognizes the individual needs of employees exposed to traumatic events that can lead to long term difficulties. Consequently, Canadian Pacific Railway has developed the Critical Incident Response Program (CIRP), which is designed to offer timely assistance to individuals in these situations. The Company's Employee and Family Assistance Program administers the Critical Incident Response Program.

### Employee Health Advisor (EHA)

A company resource responsible for the management, coordination, implementation and maintenance of a variety of occupational health and medical services, policies and programs to CP employees and prospective employees supporting their health, safety and fitness to work in the assigned regional service area. EHA's ensure employees are medically fit to perform their work in a safe manner and ensures CP complies with government regulations relating to employee medical fitness for work

### Fitness To Work Assessment Form (FTW Assessment)

A form completed by Occupational Health Services (OHS), that lists an employee's limitations and/or restrictions and provides clearance to participate in the RTW program in accordance with Railway Medical Rules for Positions Critical to Safe Railway Operations. (Appendix D)

### Functional Abilities Form (FAF) for Safety Sensitive Position/Non Safety Sensitive Position Employees

A form provided to and completed by the treating physician that lists an employee's work limitations and/or restrictions and is submitted to the workplace for RTW purposes. It does not include any confidential medical information. (Appendix C)

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 5 of 48



CANADIAN
PACIFIC

Return to Work Policy

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 6 of 48

### Functional Abilities Form (FAF) for Safety Critical Position Employees

A form provided to and completed by the treating physician that lists an employee's work limitations and/or restrictions and is submitted to the workplace for RTW purposes. It includes the option to provide separate medical information/reports in accordance with Railway Medical Rules for Positions Critical to Safe Railway Operations to OHS. (Appendix C)

### Graduated Work Program

A work-hardening program may initially result in a reduced amount of activity or time at work with a schedule to increase participation up to and including normal duties within a specified time period. Such programs must be structured and may be performed under the guidance of a rehabilitation specialist and/or a health care provider.

### Health, Safety, Security and Environment Committee (HSSE)

A senior management committee of representatives from operations and support functions that ensure there are policies, practices, procedures, guidelines and rules in place that meet regulatory requirements, support a healthy and safe workplace, ensure current and future environmental stewardship and protect the security of rail operations.

### Job Demands Analysis

A document detailing aspects of a particular job to determine the physical, cognitive, biological, chemical and environmental requirements of each job. It considers work demographics, work shift schedules, working postures, manual materials handling, repetitive tasks, equipment and machinery used. By identifying the demands of the job, treating health care providers and the Company can plan an appropriate return to work strategy. (Appendix B)

### Key Stakeholders

Individuals who may provide support to the employee during their return to work process, which may include their supervisor, Local Return To Work Committees, Regional RTW Coordinators, WCB Specialists, OHS, treating physicians, family members, rehabilitation professionals, managers, co-workers, Union representatives, CRTWC and HSSE.

### Local Return to Work Committee (LRTWC)

A Local Return to Work Committee, consisting of a local management representative and a local Union representative from the appropriate bargaining unit, assists the Company in developing RTW Plans that provide an early and safe return to meaningful work of employees who are absent from work due to occupational or non occupational injuries or illnesses and bona fide requests for workplace accommodation due to a disability.

 **CANADIAN PACIFIC**

Return to Work Policy

### Long Term Disability (LTD) Benefits

Income protection received by both Unionized and non-Unionized employees for non occupational illness or injury following expiration of WIB or STD benefits. The terms and conditions depend on the specific group contract.

### Meaningful Work

Work that will contribute to the rehabilitation of the employee and will add value to the Company.

### Modified Duties

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 7 of 48

Any job, task, function or combination of tasks or functions that an employee with a diminished capacity may perform safely. This work may incorporate, but is not limited to, regular work that has been changed, redesigned or physically modified. This may include reductions in hours or volume, as well as work which is normally performed by others, or which has been specifically designed or designated for an employee participating in a return to work plan. The work must be productive and the result of the work must have value.

### Non Safety Sensitive Positions (NSSP)

NSSP are railway positions that are not classified as safety critical or safety sensitive. These positions may have a lesser safety impact on other employees, operations and the public, however, despite the terminology, may still include positions where there is some degree of safety risk and individuals must be safety responsible. Jobs in this category include work in certain locations or in association with a potentially hazardous environment (e.g. crew bus drivers, electricians, machinists and laborers). Alternatively, other NSSP may have minimal or no safety risk, such as office workers.

### Regional Return To Work Coordinator

A Company resource for all stakeholders in the RTW process who facilitates appropriate and successful return to work/accommodations for employees.

### Return To Work Plan

A plan established in keeping with work abilities, limitations and/or restrictions received from the treating physician and or treatment provider(s), the insurance carrier, OHS, or Provincial Workers' Compensation Boards, that includes all aspects of a modified return to work plan such as: reassigned responsibilities, rescheduling, training or modification of job duties, equipment or work stations, etc. (Appendix E) Accommodations that impact seniority or Collective Agreement provisions require a more extensive RTW Agreement.

### Permanent Disability

A medical condition resulting in permanent work limitations and/or restrictions, which are the result of an occupational or non-occupational injury or illness.



**CANADIAN PACIFIC**

## Safety Critical Positions (SCP)

Railway positions mandated by legislation that are directly engaged in the operation of trains, including rail traffic control. These positions have a direct role in railway operations where impaired performance could result in a significant incident affecting the health and safety of employees, customers, customer's employees, the public, property or the environment. Safety Critical positions are listed in the Fitness to Work Policy and are reviewed periodically to reflect any changes in job function. All persons (unionized and non-unionized) who may perform any of these functions are deemed to hold safety critical positions.

## Safety Sensitive Positions (SSP)

Railway positions where impaired performance may put public safety at occasional risk as well as put at risk the safety of employees, customers, customer's employees, property or the environment. Safety sensitive positions are listed in the Fitness to Work Policy and are reviewed periodically to reflect any changes in job function. All persons (unionized and non-unionized) who may perform any of these functions are deemed to hold safety sensitive positions.

## Short Term Disability (STD) Benefits

Income protection received by non-unionized employees in the event that they are unable to work because of a non-occupational illness or injury. The terms and conditions depend on the specific group contact.

## Temporary Disability

A medical condition resulting in temporary work limitations and/or restrictions, which are the result of an occupational or non-occupational injury or illness.

## Treating Physician Letter

A letter provided to the treating physician advising them of CP's Return To Work Program. (Appendix A)

## Undue Hardship

There is no precise legal definition of undue hardship, nor is there a standard formula for determining undue hardship. Each situation is unique and needs to be evaluated individually and the Company and the Union are required to carefully review all options before they decide that an accommodation would cause undue hardship. The decision should be evidence based and not based on an assumption, opinion or on an anecdotal or impressionistic evidence of risk. Generally, some hardship can be expected in meeting the duty to accommodate and undue hardship usually occurs when the Company cannot sustain the economic or efficiency costs of the accommodation. This means the Company is not expected to provide accommodation if doing so would bring about undue hardship based on health, safety, and/or financial considerations. Additionally, accommodations must not cause undue hardship to the unions.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 8 of 48



**CANADIAN PACIFIC**

Return to Work Policy

### Weekly Indemnity Benefits (WIB)

Income protection received by unionized employees in the event that they are unable to work because of a non-occupational illness or injury. The terms and conditions depend on the specific group contract.

### Work Limitations

An element of a job, (task, schedule, environment), that the employee can perform, but not to the usual expectations of the job, (duration, frequency, intensity), because of a medical condition or its treatment.

### Work Restriction

An element of a job, (task, schedule, environment), that the employee must not, or cannot, perform because of a medical condition or its treatment. Performance of the job may cause undue risk to self or others.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 9 of 48

### Workers' Compensation Board (WCB)

Provincial Workers' Compensation Boards are independent organizations that manage workers' compensation insurance based on legislation. Each WCB is Provincially legislated. They are employer funded to provide cost-effective disability and liability insurance for compensable work related injuries or illness.

All references to the WCB in this policy includes the Commission de la Sante et de la Securite du Travail (CSST) in the Province of Quebec and the Workplace Safety & Insurance Board (WSIB) in Ontario.

### Workers Compensation Benefits

WCB compensates injured workers for lost income, health care and other costs related to a work-related injury or illness.

### Workers Compensation Board Specialist (WCB Specialist)

A Company resource acting as a central point of contact for the Provincial Workers' Compensation Boards (WCB) and the Company for all matters related to the WCB claim. Any information communicated to and from the WCB is the responsibility of the WCB Specialist.



CANADIAN
PACIFIC

Return to Work Policy

# 4.0 Policy Statement

CP is committed to supporting a RTW program for all permanent and temporary injuries or illnesses with the following principles:

- All Company employees sustaining occupational and non-occupational related injuries or illnesses will be assisted in their rehabilitation where possible through the RTW Program.

- Front Line Managers (FLM)/Supervisors have the primary responsibility for the RTW Program.

- The Company shall make every reasonable effort to provide suitable meaningful employment to employees who are unable to return to their regular duties as a result of an injury or illness. This will include training and/or the modification of workstations or equipment, or job duties to accommodate the employee, provided that such accommodation does not create undue hardship.

- All employees who are medically able are expected to work when appropriate accommodations are available. Employee are responsible for participating in the program to the best of their ability and capacity.

- All employees not medically able to work will seek immediate and appropriate treatment and, when medically able, will return to work.

- An employee in this program must not pose an undue safety risk to themselves or other employees. Care will be taken to ensure that the safety risk is assessed by all stakeholders in the context of the various duties that can reasonably be made available to employees.

- Early intervention is considered the cornerstone of the RTW program and the FLM/Supervisor is responsible for initiating and implementing their employee's return to work plans in a timely manner in consultation and conjunction with the Regional RTW Coordinator, and where applicable the LRTWC in accordance with the relevant collective bargaining agreements.

- An accommodation will end once the employee is able to resume working in his/her original position without modification.

- When an employee cannot otherwise be accommodated due to permanent work limitations and/or restrictions, as per the Workplace Accommodation Policy 1501, the Regional Return To Work Coordinator will conduct a search for a permanent accommodation in an alternate position within the Company. Senior management review and approval is required for all permanent accommodations via the AVP, VP or equivalent. Senior Union involvement will also be required for any permanent bargaining unit(s) accommodations.

### Confidentiality

During the course of an employee's involvement with the RTW Program, key stakeholders may encounter personal and sensitive information, which must be maintained confidential to the key stakeholders involved.

Any personal information received will be maintained in a confidential file and will not be released to anyone except those authorized to receive it, or as authorized by law.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 10 of 48

 **CANADIAN PACIFIC**

Return to Work Policy

When developing and implementing a RTW Plan, key stakeholders will restrict information to work limitations and/or restrictions of the individual, and not medical information or diagnosis.

All occupational health medical records containing personal health care information (e.g., medical diagnosis, results of medical tests, physician reports, occupational fitness documents and other similar information) is maintained on the employee's health file with access by OHS only.

All Workers' Compensation (WCB) records containing personal health care information (e.g., medical diagnosis, results of medical tests, physician reports, occupational fitness documents and other similar information) is maintained on the employee's WCB file with access by the WCB Specialists and OHS only.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 11 of 48



Return to Work Policy

**Company/Union Commitment**

CP and the participating Unions have entered into the following Letter of Agreement:

CP and the participating Unions recognize that an early return to productive employment in the workplace will assist in achieving speedy rehabilitation as well as allowing employees to maintain their personal dignity and financial stability. Accordingly, CP will make every reasonable effort to accommodate employees coming within the scope of the Return To Work Policy with suitable alternate, temporary or permanent employment, by reviewing, and if necessary, modifying their regular duties.

In consideration of accommodating an employee with a disability the following shall apply in the order listed below:

- First, the employee's present position shall be considered for modification,
- Second, positions within the employee's classification shall be considered,
- Third, positions within the bargaining unit shall be considered,
- Fourth, positions outside the bargaining unit shall be considered.

Any alteration in seniority shall only be considered as a final resort after all other avenues have been duly considered by both parties. The company and the respective Union(s) must agree to any alterations of seniority. Alterations of seniority on other than short-term cases must be approved by the appropriate Senior Union representative who has jurisdiction under the appropriate collective agreement.

The Collective Agreement terms, which are superior to these guidelines, will not be superseded except as mutually agreed in order to accommodate an employee with a disability. This agreement can be cancelled by the Company or any of the participating unions upon sixty-days (60) notice from either party. Notice of cancellation will affect the relationship in question and not all parties covered by this agreement.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 12 of 48



**CANADIAN PACIFIC**

## 5.0 Roles & Responsibilities

The following roles and responsibilities relating to this policy are outlined below:

It is the responsibility of the **Employee** to:

- Read, understand and comply with this policy.
- Work in a healthy and safe manner.
- Report all work-related injuries and illnesses immediately to his/her FLM/Supervisor.
- Report all absences related to non-occupational injuries or illnesses immediately to his/her FLM/Supervisor in the prescribed manner.
- Seek immediate medical attention as needed.
- Consult with their treating physician for appropriate care and treatment to determine when participation in the RTW program is appropriate.
- Be aware and be governed by their responsibilities under the Fitness to Work Policy for SCP employees.
- Provide required documents to their treating physician and advise the treating physician that the FAF should be completed during the office visit so that it may be returned to the workplace by fax or by hand within seventy- two (72) hours.
- Follow-up with his/her doctor if the FAF is not completed during the doctor's visit, to ensure that the form is faxed to the appropriate recipient in a timely manner.
- Ensure the completion and return of the Initial FAF to OHS, if a SCP employee, within seventy- two (72) hours of the injury/illness report.
- Ensure the completion and return of the Initial FAF to their FLM/Supervisor, if a SSP or NSSP employee, within seventy–two (72) hours of the injury/illness report.
- Ensure the completion and timely submission of Weekly Indemnity Benefit forms when applicable.
- Comply with all recommendations of treatment provider(s).
- Attend all medical or rehabilitation appointments as required. While being accommodated, schedule all medical and therapy appointments relating to the injury/illness outside of work hours where practicable and discuss any exceptions with their FLM/Supervisor.
- Maintain contact with their FLM/Supervisor by telephone at least once per week when the employee's injury or illness results in lost time,.
- Maintain contact with their physician and FLM/Supervisor while participating in the RTW plan, advising of progress or concerns and working together to make adjustments as necessary to ensure every opportunity for their successful return to work.
- Attend meetings as required, working with their FLM/Supervisor, the Regional RTW Coordinator and the LRTWC, as indicated, to develop suitable modified duties and work schedules.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 13 of 48



CANADIAN
PACIFIC

Return to Work Policy

- Provide supporting functional abilities and restrictions information to their FLM/Supervisor if they are unable to continue with their RTW plan outlining the reasons for discontinuing.

- Supply updated FAF's to their FLM/Supervisor as their abilities change or as requested by their FLM/Supervisor to support ongoing RTW Planning.

- Supply updated FAF's and medical information to OHS as required and requested if they are SCP employees under an OHS FTW Assessment.

It is the responsibility of the **Front Line Manager (FLM)/Supervisor** to:

- Read, understand and comply with this policy.

- Establish a trusting relationship with employees to ensure their successful participation in the RTW program.

- Ensure all employees in their area of responsibility are provided with an orientation to the RTW Program and a copy of the RTW pamphlet. (Appendix F & G)

- Ensure that employees are provided with the appropriate RTW packages and all relevant paperwork required to report injuries or illnesses within 24 hours of the injury or illness being reported to them by the employee.

- Obtain the completed FAF and/or the Fitness to Work Assessment for SCP employees from OHS within seventy-two (72) hours.

- Obtain the completed FAF from a SSP or NSSP employee or his/her treating physician or health care provider within seventy-two (72) hours.

- Fax invoices only from the SSP/NSSP FAF's to OHS for payment processing.

- Consult with LRTWC union members regarding the development of an employee's RTW Plan, provided that the union member is readily available, either in person or via telephone, and the employee's RTW will not be delayed as a result of the LRTWC union member not being available.

- Provide all FAFs or Fitness to Work Assessments, and RTW Plans to the LRTWC, RTW Coordinator and, where applicable, the WCB Specialist.

- Request additional FAFs from the employee as required to ensure proper RTW Planning.

- Develop and implement relevant RTW plans in conjunction with the Regional RTW Coordinator & LRTWC.

- Ensure the employee has received and signed the RTW plan.

- Advise the appropriate LRTWC Union Representative should an employee reject a documented offer of modified work.

- Consult with OHS if they have any medical concerns regarding an employee's medical fitness to work.

- Consult with their Regional RTW Coordinator and LRTWC, if required, if they are unable to reach consensus with the employee on the implementation, content, or progress of an employee's RTW plan.

- Advise their Regional RTW Coordinator, LRTWC, and WCB Specialist (where applicable) of any interruption in the RTW plan, including any deviation of hours and duties.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 14 of 48



CANADIAN
PACIFIC

Return to Work Policy

- Work with the relevant stakeholders in determining necessary work site modifications in response to recommendations by qualified personnel.

- Establish weekly telephone contact with lost time injured and ill employees.

- Monitor and evaluate the employee's performance during his/her modified return to work.

- Inform co-workers in advance of an employee commencing the RTW program, where appropriate, outlining any relevant details with respect to the RTW plan, duties and schedules.

- Mentor, caution, and/or deal administratively with employees who fail to comply.

- Ensure employees are treated with respect by their co-workers and are not subject to harassment.

It is the responsibility of the **Regional Return To Work Coordinators** to:

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 15 of 48

- Maintain appropriate contact with the employee and all stakeholders in the RTW policy, as required.

- Assist all stakeholders to co-ordinate the RTW activities for individual employees and implement the return to work process.

- Develop, implement and maintain the Company's Modified Work Inventory and Job Demands Analysis Inventory used to assist in developing RTW plans.

- Ensure all stakeholders understand the procedures and their responsibilities.

- Consult with the employee, Union, FLM/Supervisor, treating physician, OHS, LRTWC, WCB Specialists, Insurance Carrier and other stakeholders on abilities/restrictions, job demands, physical demands analysis, work limitations and/or restrictions and timing of return to work.

- Review and refer RTW plans or cases to OHS in cases of medical fitness to work issues.

- Develop RTW plans and job matches in conjunction with the FLM/Supervisor and LRTWC when an employee cannot go back to the pre-injury or pre-illness job.

- Ensure RTW plans are reviewed and endorsed by the employee, Union (where applicable), and FLM/Supervisor.

- Co-ordinate supporting assessments and programs with OHS, WCB Specialists, and the Insurance Carrier as required.

- Investigate and resolve issues concerning FAF's, including but not limited to: appropriateness or clarification of restrictions/limitations provided; or, doctors not completing or submitting them in a timely manner.

- Convene and participate in RTW case meetings as required.

- Review all RTW cases with each new FAF received and/or at 90 day intervals to ensure the plan remains appropriate.

- Compile information such as key performance indicators on the RTW program in conjunction with OHS, WCB Specialists, Safety and other key stakeholders.

- Maintain relevant statistics and provide quarterly reports on the functioning of the RTW program to the CRTWC and HSSE Committees.

- Oversee the day-to-day functioning of the RTW program in their region.

 **CANADIAN PACIFIC**

Return to Work Policy

- Ensure consistency of application in the RTW program.
- Provide training as required in the RTW program to key stakeholders in conjunction with OHS, Safety and Technical Training.
- Ensure appropriate general communication about the RTW policy and program.
- Provide assistance with inter/intra-departmental transitional work and placements.
- Liaise with WCB Specialists and Insurance Carriers to obtain relevant employee functional ability information to facilitate RTW planning.
- Develop and maintain an atmosphere of trust and mutual support by ensuring that employee's rights are respected, that FLM/Supervisor and Union concerns are addressed, and that confidentiality is assured and maintained.
- Provide technical expertise, interpretations, and job aids as required to support this policy.
- Be current and abreast of changes to relevant legislation and plans including, but not limited to, the Canadian Human Rights Act, Canada Labour Code, Provincial Workers' Compensation Acts, the Company's Group Medical Plans, collective bargaining agreements, etc.

It is the responsibility of the **Union(s)** to:

- Take an active role as partners in the return to work and accommodation process.
- Provide accommodation advice and guidance.
- Support accommodation and RTW measures and plans unless to do so would impose an undue hardship on the Union or employee.
- Work with the Company to address existing barriers in the collective agreement and ensuring that no new barriers are added.
- Select or appoint appropriate union representatives for the Local RTW Committees.

It is the responsibility of **Occupational Health Services (OHS)** to:

- Review all Functional Ability Forms, Insurance Providers' Attending Physician Statements, Medical Reports & RTW plans for employees in Safety Critical positions ensuring the provisions of the Railway Safety Act, Railway Medical Guidelines and the Fitness to Work Policy are met.
- Provide Fitness To Work Assessments to the FLM/Supervisor for employees in SCP's where the treating physician has indicated a medical condition in accordance with Railway Medical Rules for Positions Critical to Safe Railway Operations.
- Develop and maintain an atmosphere of trust and mutual support by ensuring that employees' rights are respected and that confidentiality of all medical and personal information is assured and maintained.
- Be current and abreast of changes to relevant legislation and plans including but not limited to the Canadian Human Rights Act, Canada Labour Code, Provincial Workers' Compensation Acts, and the Company's Group Medical Plans, etc.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 16 of 48



**CANADIAN PACIFIC**

Return to Work Policy

- Provide ongoing advice and support to the FLM/Supervisor, Regional RTW Coordinators and WCB Specialists.

- Organize and co-ordinate Company-initiated Independent Medical Examinations and Functional Capacity Evaluations for employees participating in the RTW program as necessary and in conjunction with the Regional RTW Coordinators and WCB Specialists.

- Participate in case conferences as required.

- Review the particulars of cases with all key stakeholder in an effort to find a resolution when issues arise as a result of disputes regarding medical fitness to work for an employee.

- Obtain any required medical information from the WCB and provide relevant medical information to the WCB through the WCB Specialist as required.

It is the responsibility of the **Chief Medical Officer and designate** to:

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 17 of 48

- Act as resource to OHS for determining fitness to work and RTW plans for SCP employees.

- Attend scheduled meetings regarding RTW plans for employees as requested/required by the Employee Health Advisors.

It is the expected role of the **Employee's Treating Physician or Health Care Provider** to:

- Provide appropriate medical treatment to the employee to ensure optimal recovery.

- Complete the FAF, Medical Report and any other required medical information as it pertains to the functional limitations and/or restrictions and medical status of an injured or ill employee within 72 hours.

- Communicate any fitness to work issue to OHS as it relates to SCP employees in accordance with Railway Medical Rules for Positions Critical to Safe Railway Operations.

- Communicate with the employee and the RTW Coordinator to obtain a clear understanding of the employee's job duties and any RTW plans.

- Work with the employee and the Company as required in reviewing RTW plans, and work limitations and/or restrictions.

- Maintain an ongoing patient/physician relationship with the employee participating in the RTW program to ensure the employee has the necessary medical support and resources for a successful return to work.

- Provide pertinent medical information to OHS and/or functional information to the workplace upon receipt of a signed consent by the employee.

- Provide timely referrals of the employee to appropriate specialists as required.

- Notify the employee and the FLM/Supervisor when the employee is able to return to regular duties by providing an updated FAF.

- Be aware of and be governed by the Railway Safety Act provisions for Railway Medical Rules for Positions Critical to Safe Railway Operations.



**CANADIAN PACIFIC**

Return to Work Policy

It is the responsibility of the **Local Return to Work Committee (LRTWC)** to:

- Receive and review all applicable FAFs, Fitness to Work Assessments, and RTW plans within their area of responsibility

- Assist the FLM/Supervisor and the Regional RTW Coordinator as required in the RTW and accommodation plans of unionized employees.

- Provide guidance to key stakeholders and promote accountability in their sphere of influence regarding responsibilities and obligations under the Duty to Accommodate and RTW Program.

- Consider and expeditiously dispose of matters concerning local RTW and accommodation issues.

- Develop, implement and maintain an appropriate file system for all information relating to employees participating in the RTW Program including, but not limited to, FAFs, Fitness to Work Assessments, RTW plans, and RTW Meeting notes/minutes.

- Ensuring LRTWC activities during regular work hours are approved by the appropriate FLM/Supervisor prior to their commencement.

- Progress RTW cases to the appropriate senior union representatives and senior manager(s) when required or deemed necessary.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 18 of 48

It is the responsibility of the **Core Return to Work Committee (CRTWC)** to:

- Review the Company's RTW Policy and program and provide recommendations to ensure it remains in step with legislation and best practices.

- Recommend policy direction and monitor the RTW Program to ensure it operates according to policy and procedure.

- Educate management and Unions about their obligations under the RTW program and ensure the effective implementation of the program in the Company's and Unions' mainstream processes.

- Promote accountability among functional groups and all stakeholders to meet their responsibilities under the RTW Program.

- Identify and recommend changes to systemic barriers that may negatively affect the RTW process.

- Act as a resource regarding the RTW Program for other key stakeholders, other Company Committees and external resources.

- Consider and expeditiously manage RTW issues raised by members of the committee or referred to the committee by LRTWC's.

- Monitor data on injuries and illness and the RTW program.


CANADIAN PACIFIC

Return to Work Policy

The CRTWC will consist of the following representatives:

| UNION | MANAGEMENT | ADVISORS (EX-OFFICIO) |
|---|---|---|
| TCRC (RAIL) | Group VP Operations | Chief Medical Officer |
| TCRC (MWED) | General Manager, Track Renewal & Work Equipment | Director, Employee Relations & Chief Privacy Officer |
| CAW | Director, Talent Acquisition & Development | Manager, Labour Relations |
| USW | VP Transportation | Manager, Occupational Health Services |
| CPPA | Return To Work Manager | Director, Benefits |
| IBEW | | |

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 19 of 48

It is the responsibility of the **Health, Safety, Security and Environment Committee (HSSE)** to:

- Adopt a strategic planning process and annually approve corporate Health, Safety, Security and Environmental plans including RTW metrics that take into account opportunities and risks.

- Establish annual performance objectives and targets for RTW matters.

- Ensure there are RTW policies, practices, procedures, guidelines and rules in place that meet regulatory requirements to support a healthy and safe workplace, ensure and protect the security of rail operations.

- Periodically review and approve policies related to RTW matters.

- Review RTW metrics and trends to determine if changes in process or policy are required to meet targets.



## 6.0 Return To Work Process

### Reporting Occupational Injury or Illness (WCB)

Employees who are injured or who suffer an illness at work must report the injury/illness to their FLM/Supervisor immediately. Employees who incur an occupational injury/illness must complete the appropriate Provincial WCB employee reporting form.

If an injury/illness occurs at work, the Company will provide transportation from the work site to the hospital/physician as necessary. To respect the employee's privacy, the FLM/Supervisors or First Aid Attendants will not accompany the employee while being examined, nor speak to the physician or discuss the employee's medical details with the physician. However, where possible, they will provide the employee with a RTW Package and a tentative RTW Plan for the physician's review and immediate completion of the FAF.

If the employee reports the work-related injury/illness during off-duty hours or when not physically at work, the FLM/Supervisor will provide the employee with the appropriate RTW Package within 24 hours of being notified.

The FLM/Supervisors must ensure that a MARVIN Personal Injury report is completed within 24 hours and the LRTWC is notified if the employee is Unionized. Employees shall not lose wages that they would have otherwise earned during that shift.

The WCB Specialists will coordinate WCB claim reporting activities ensuring timely communication of information relating to the employee's WCB claim to the RTW Coordinators, FLM/Supervisors, and OHS as necessary.

### Reporting Non Occupational Related Injury or Illness (WIB/STD)

Employees must report their absence to their FLM/Supervisor in the manner already established within the workplace. The employee is also responsible for contacting their FLM/Supervisor for information about the RTW program and maintaining regular contact with the workplace.

The FLM/Supervisor must provide the appropriate RTW Package to the employee with 24 hours of being notified of an absence where the employee may be eligible for either STD or WIB.

Employees are responsible for the completion and submission of the Employee and Treating Physician portion of the WIB or STD application in a timely manner. The Manager (for STD) or Employees Services (for WIB) will complete the Employers' portion of the form in a timely manner.

### Status Change Form

The FLM/Supervisor must complete and submit a Status Change Form as indicated on the form within 24 hours of:

- A workplace injury or illness

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 20 of 48


CANADIAN
PACIFIC

Return to Work Policy

- Being notified of an absence from work due to a non-occupational injury or illness when the employee may be eligible for either WIB or STD

- an employee's modified return to work in any capacity

- an employee's fulltime return to work without restrictions or limitations

### Return to Work

Should the injury/illness result in time loss or require a physician visit, FLM/Supervisors are responsible for providing the employee with the appropriate RTW package. The RTW package includes:

| RTW PACKAGE SCP | RTW PACKAGE SSP/NSSP |
|---|---|
| SCP Letter to Treating Physician | SSP/NSSP Letter to Treating Physician |
| Return To Work Pamphlet | Return To Work Pamphlet |
| 2 SCP Functional Abilities Forms & Medical Reports | 2 SSP/NSS Functional Abilities Forms |
| Job Demands Analysis (job specific) | Job Demands Analysis (job specific) |
| WIB or STD Forms - if not work related | WIB or STD Forms - if not work related |

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 21 of 48

The employee must provide the required documents to their treating physician and advise the treating physician that the FAF should be completed during the office visit so that it may be returned to the workplace by fax or by hand within seventy- two (72) hours. If the FAF is not completed during the doctor's visit, the employee must follow-up with the doctor to ensure that the form is faxed to the appropriate recipient in a timely manner.

Employees participating in the program will not be expected to pay for the completion of the Company required FAF's and medical reports. However, in the event that a doctor requires payment from an employee before releasing the completed forms or reports, the employee must obtain a receipt for the payment from the doctor and, upon submission to the Company, will be reimbursed for the full amount shown on the receipt.

**SCP Employees** are responsible for ensuring the completed FAF and, if the medical conditions requires it, the completed medical report, is sent to OHS. In the event that the treating physician has concerns regarding an employee's fitness for work in relation to Railway Medical Guidelines they will complete the medical report portion of the FAF for SCP employees as well as the functional abilities information. On receipt of the completed forms, OHS will review. If the medical report has not been completed, and there are no medical concerns, the FAF will be forwarded directly to the FLM/Supervisor by OHS, copying the Regional RTW Coordinator and WCB Specialist. If the medical report has been completed the relevant Employee Health Advisor will review, follow up and provide the FLM/Supervisor and Regional RTW Coordinator with a Fitness To Work Assessment.

**SSP/NSSP Employees** are responsible for ensuring their FLM/Supervisor receives the completed FAF in a timely manner.



**CANADIAN PACIFIC**

Return to Work Policy

### Functional Abilities Form

The completed form will indicate one of the following:

- **Fit for Usual Duties of this Position.** The employee is able to return to full duties on a full time basis without the need for a return to work plan. In this instance the employee returns to work immediately or on the next assigned shift, without any modified work/RTW plan involvement. **OR;**

- **Fit for Modified/Alternate Duties.** The employee is able to return to work, however they require modification to their regular duties or hours worked to promote and assist in a return to regular, pre-injury/illness position whenever possible. Work limitations and/or restrictions will be detailed so the FLM/Supervisor can implement the RTW plan in conjunction with the Regional RTW Coordinator and LRTWC if required. **OR;**

- **Unfit for any work.** The employee may be able to return to their regular duties after a period of absence, which may include the need for a rehabilitation and/or RTW plan prior to returning to full duties. The FLM/Supervisor will monitor the employees' progress with a view to implementing a RTW plan sharing all relevant information with the Regional RTW Coordinator, LRTWC, OHS and WCB Specialist as required. If the FLM/Supervisor receives an "Unfit" FAF from a Non Safety or Safety Sensitive employee who was injured at work, he should immediately consult with the RTW Coordinator regarding same.

### Return To Work Plan

The FLM/Supervisor will consult with the LRTWC union members, either in person or via telephone, regarding the development of an employee's RTW Plan. The employee's RTW must not be unduly delayed as a result of the LRTWC union member or his/her alternate not being readily available and, in any case, will not prevent the FLM/Supervisor and LRTWC union member from consulting at a later time.

When available and appropriate, based on the nature or severity of the injury/illness, the FLM/Supervisor may provide Sedentary, Non-Safety Sensitive, non-bargaining unit work to an employee prior to receiving the completed FAF. This Pre-FAF Option of modified work must only be put into place until the completed FAF is received, reviewed, and a new RTW Plan is implemented.

NOTE: An employee who is involved in a serious workplace incident and is participating in the Critical Incident Response Program (CIRP) should NOT be offered this Sedentary, Non-Safety Sensitive, non-bargaining unit work. If more time off is required beyond the requisite 72 hours, as set out in the CIRP Policy, the employee must be advised to see his/her physician immediately. The FLM/Supervisor may only advise the employee that modified work is available should his/her doctor feel it is appropriate. The RTW Coordinator should be consulted in all cases where additional time off is required for Critical Incident Stress.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 22 of 48



**CANADIAN
PACIFIC**

Return to Work Policy

When the FLM/Supervisor does receive the completed FAF, it should be provided to the Regional RTW Coordinator and LRTWC within 24 hours. It is the FLM/Supervisor's responsibility to develop the RTW Plan in consultation with the LRTWC as soon as possible by matching the employee's work limitations and/or restrictions as indicated on the FAF with available modified or alternate duties. The Supervisor may also consult with their Regional RTW Coordinator to assist in the development of the RTW plan.

If the employee requires modified work, (regular or alternate position), the FLM/Supervisor together with the employee and LRTWC will develop a written RTW Plan on the prescribed form with specific time frames. The RTW plan must involve meaningful work. The employee must sign the RTW Plan Form as agreement and commitment to participate in the plan. If the employee refuses the modified work and does not sign the RTW Plan, the FLM/Supervisor must indicate on the RTW Plan the employee's reason, if any, for refusing the offer and then sign the RTW Plan. The FLM/Supervisor must advise the appropriate LRTWC Union Representative should an employee refuse a documented offer of modified work.

A copy of the all RTW Plans (accepted or declined, signed or unsigned by the employee) must be sent to the Regional RTW Coordinator, LRTWC, the WCB Specialist for work-related injuries or illness, and the Employee Health Advisor for all Safety-Critical employees.

A proposed RTW accommodation involving seniority issues must be forwarded to the appropriate senior union representative and senior manager(s) for their consideration. A more extensive RTW Agreement may be required in such cases.

## No Modified Work Available

If consultation between the FLM/Supervisor, employee, Regional RTW Coordinator, and LTRWC fails to result in the implementation of a RTW plan, the FLM/Supervisor must document RTW discussions including all options considered and reasons for rejecting them. The case may then be progressed to the relevant Senior Manager and/or Senior Union Representative by their respective LRTWC representatives. Issues may include but are not limited to:

- The employee has permanent restrictions and no local accommodation is available.
- The employee has permanent restrictions and only temporary modified work is available.
- The proposed modified duties are considered inappropriate by the employee or union.
- A request for specific duties by the Union or Employee is considered inappropriate by management.

When deemed necessary, the LRTWC Union Representative will progress RTW cases along with all relevant documentation to the appropriate senior union representative.

The FLM/Supervisor will progress RTW cases along with all relevant documentation to the appropriate senior manager(s).

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 23 of 48



**CANADIAN PACIFIC**

## Return to Work Policy

When an employee with permanent restrictions cannot be accommodated in his/her original position, the RTW case must be progressed to the appropriate senior manager(s) and senior union representative for review.

### Employee Non-Compliance

WCB legislation and disability benefit contracts require employees to fully cooperate with the RTW program by providing required medical information, following treatment plans, participating in accommodation planning and performing appropriate modified duties to the best of their abilities.

In the case of occupational related injury or illness, a refusal by an employee to participate in a reasonable offer of modified work will be referred back to the relevant WCB by the WCB Specialist for review. The refusal may impact the employee's WCB benefits.

For non-work related injury or illness, an employee's refusal to accept or participate in a reasonable offer of modified work will be referred back to the Insurance Carrier for review. The employee's disability benefits may be affected by this refusal.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 24 of 48

### Wage Rates for Modified Work

Where an employee cannot return to their regular position and as a result is provided suitable alternate employment within the Company, the appropriate wage rate will be established by considering the rate of that particular position, the pre-injury rate of the employee, and, where applicable, the Provincial workers' compensation maximum.

### WCB Benefits

Where the rate the employee is paid by the Company is lower than their regular rate, they may be eligible for additional compensation through the WCB. In addition, WCB will often continue to provide benefits (partial or full) to employees who are participating in work trials, modified duties/hours or gradual return to work programs.

### WIB/STD/LTD Benefits

The Service Provider may grant partial or full benefit payments for an employee who participates in any kind of return to work program as long as they remain eligible for benefits. The amount of benefit provided will depend on the amount of hours worked and the respective benefit plan.

### Automatic 90 Day Return to Work Evaluation

The Regional RTW Coordinator will evaluate RTW plans every 90 days when it is indicated that the employee's modified work plan extends beyond 90 days from the start date of the injury or illness. Additionally, an employee's prolonged absence due to a disability will also be evaluated every 90 days from the start date of the injury or illness.



**CANADIAN PACIFIC**                                      Return to Work Policy

These evaluations may include:

- A request for an updated FAF or medical report completed by the health care provider.

- A review of the updated functional abilities information with the employee, the FLM/Supervisor, LRTWC, and Regional RTW Coordinator with the intent to either:

  o   Implement a new RTW Plan **OR**

  o   Adjust the work limitations and/or restrictions in a RTW Plan **OR**

  o   Adjust a RTW Plan completion date **OR**

  o   Consider a permanent accommodation **OR**

  o   Consider referral back to WCB or Insurance Carrier.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 25 of 48

## 7.0 Administration

**Policy Name:**
Return to Work Policy
**Document Number:**

**Document Owner:**
HSSE Committee

**Policy Location:**
Rail City

**Effective Date:**
1st March 2010
**Revision Date:**
1st November 2010
**Issuing Department:**
Human Resources

**Policy Administration:**
Return To Work Manager

## 8.0 Related Documents/Resources

Workplace Accommodation Policy (1501)    Critical Incident Response Program

Fitness to Work Policy (8.01)



**CANADIAN PACIFIC**

Return to Work Policy

## APPENDIX A

# TREATING PHYSICIAN LETTER - SCP

Dear Treating Physician,

Canadian Pacific Railway (CP) has a Return To Work program to assist injured workers back to pre-injury duties as soon as they are medically able. **This program includes modified or alternate duties for employees with work limitations and/or restrictions.**

CP employees can occupy one of the following safety categories: Safety Critical, Safety Sensitive and Non-Safety Sensitive. **Your patient is in a Safety Critical Position.**

**Safety Critical Positions** are mandated by Transport Canada and have a direct role in safe railway operations where impaired performance due to a medical condition could result in a significant incident affecting the health and safety of employees, the public, property or the environment. e.g. Locomotive Engineers, Conductors and Rail Traffic Controllers.

You are responsible under the Railway Safety Act to notify the Railway Company Chief Medical Officer if an employee has a medical condition that could be a threat to safe railway operations. These conditions are listed in Part 1 of the attached Functional Abilities Form.

Please complete and sign Part 4 of the Functional Abilities Form. In addition if your patient is presenting with any of the listed medical conditions you are required to also complete Part 5 of the form

The attached Job Demands Analysis (where available) may assist you in understanding the job requirements.

**Please fax the completed form and invoice to OHS at 1 403 319 6803.**

Thank you for your cooperation and assistance with our program.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 26 of 48


**CANADIAN PACIFIC**

Return to Work Policy

# FITNESS TO WORK CONSIDERATIONS FOR SAFETY CRITICAL POSITIONS

## (Taken from the CMA Driver's Guide 7th Edition)

The physical and mental capabilities that must be reviewed when considering fitness for duty for any safety critical position include, but are not limited to:

1. Cognition: must have normal function for:
   - Alertness
   - Judgment
   - Concentration
   - Comprehension of *concurrent* written, verbal and signal-based communication
   - awareness of the environment and other members of the work crew, and
   - vigilance for prolonged periods.

2. Special senses:
   - visual, including color perception, and hearing must meet government legislated standards

3. Ability to tolerate and function in a stressful work environment; which includes a highly variable work shift.

4. Must not be subject to sudden impairment of physical or mental capabilities.

   The following capabilities **must also be assessed**, depending on the specific job function:

**LOCOMOTIVE ENGINEER**
- Must be able to walk, climb and very occasionally lift 36 kgs (80 lbs) from floor to waist level.
- May have to walk extended distances in variable weather conditions and on uneven terrain.

**CONDUCTOR (BRAKEPERSON / YARDPERSON / TRAINMAN)**
- Must be able to walk, climb and occasionally lift 80 lbs. from floor to waist level.
- Must be able to walk in variable weather conditions and on uneven terrain.
- Good strength and endurance is required in the arms, shoulders and upper back.
   e.g. Performing track switching duties requires:
   - 17-19 kgs (37 to 41 lbs) of force to lift switch lever up
   - 18-27 kgs (40 to 60 lbs) of force to pull switch over
   - 17-19 kgs (37 to 41 lbs) of force to lock switch lever back in place
- A good sense of balance is required as these tasks are performed outdoors where terrain may be uneven and slippery, wet, icy or snow covered.

**RAILWAY TRAFFIC CONTROLLER (RTC)**
- Must be able to sit for prolonged periods. Limited physical demands.
- Must have the ability to use a keyboard to enter instructions.
Must be able to concentrate for prolonged periods while viewing a computer screen and listening and/or reacting to communications simultaneously.

The attached Job Demands Analysis (where available) may assist you in understanding the job requirements.

Return To Work Policy NOVEMBER 2010 Final.doc          – 26 –

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 27 of 48



CANADIAN
PACIFIC

Return to Work Policy

# TREATING PHYSICIAN LETTER – SSP & NSSP

Dear Treating Physician,

Canadian Pacific Railway (CP) has a Return To Work program to assist injured workers back to pre-injury duties as soon as medically able. **This program includes modified or alternate duties for employees with restrictions.**

CP employees can occupy one of the following safety categories:  Safety Critical, Safety Sensitive and Non-Safety Sensitive. Your patient is in either a Safety Sensitive or a Non Safety Sensitive Position.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 28 of 48

**Safety Sensitive Positions** involve work with heavy moving equipment, work at heights, and work with railway machinery or railway policing duties. These are positions where impaired performance may put public safety at occasional risk, as well as putting at risk the safety of employees, customers, customer's employees, property or the environment. This group includes employees who work around "live track". From the safety aspect, the highest risk groups include employees working with and around heavy moving equipment - machine operators, together with those working at heights - bridge/signal maintenance workers, top lift operators and crane operators.

**Non Safety Sensitive Positions**, despite the terminology, may still include positions where there is some degree of safety risk and individuals must be safety responsible. Jobs in this category include work in certain locations or in association with a potentially hazardous environment - crew bus drivers, electricians, machinists and laborers. Alternatively, other Non Safety Sensitive positions may have minimal or no safety risk, office workers would be in this category.

The attached Job Demands Analysis (where available) may assist  you in understanding the job requirements.

Please complete and sign the attached Functional Abilities Form.

**The completed form may be faxed directly to the employee's supervisor as indicated on the form or provided to the employee for submission.**

Thank you for your cooperation and assistance with our program.

# FITNESS TO WORK CONSIDERATIONS FOR SAFETY SENSTIVE AND NON SAFETY SENSITIVE POSITIONS

The physical and mental capabilities that must be reviewed when considering fitness for duty for **Safety Sensitive Positions**, depending on the specific job function include, but are not limited to:

1. **Cognition:** must have normal function for:
   a) alertness,
   b) judgment,
   c) concentration,
   d) comprehension of written, verbal and signal based communication,
   e) awareness of the environment and other members of the work crew, and
   f) vigilance for prolonged periods.
2. **Special senses:** Vision (including color perception) and hearing – must meet safe standards
3. Ability to tolerate and function in a **stressful work** environment; which includes a highly variable work shift.
4. Ability to work at **heights** (Bridge workers, crane operators)
5. Ability to work **alone** or in **isolated locations** (some Field workers)
6. Must not be subject to **sudden impairment** of physical or mental capabilities.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 29 of 48

The following capabilities must also be assessed, for both **Safety Sensitive Positions** and **Non Safety Sensitive Positions** depending on the specific job function:

- Must be able to walk, climb and occasionally lift 80 lbs. from floor to waist level.
- Must be able to work in variable weather conditions and walk on uneven terrain.
- Good strength and endurance is required in the arms, shoulders and upper back.
  e.g. Performing track switching duties requires:

  - 37 to 41 lbs. of force to lift switch lever up
  - 40 to 60 lbs. of force to pull switch over
  - 37 to 41 lbs. of force to lock switch lever back in place

- A good sense of balance is required as these tasks are performed outdoors where one is subjected to uneven terrain that can be slippery, wet, icy or snow covered.

The attached Job Demands Analysis (where available) may assist you in understanding the job requirements.

# APPENDIX B
# JOB DEMANDS ANALYSIS EXAMPLE

## LOCOMOTIVE ENGINEER

| PRIMARY RESPONSIBILITIES |
|---|
| Operates locomotive units, rail diesel cars, and passenger control cars which involves operating the accelerator, brakes and communicating via a 2-way radio. Interprets train orders, timetables, train signals, and railway rules/regulations to transport freight or passengers in a safe and satisfactory manner. |

| DESCRIPTION OF TOOLS, MATERIALS AND/OR MACHINERY USED |
|---|
| Locomotive unit with controls and signals. Required to have rulebooks, paperwork on each trip. Radio and IDU (computer). Steel toe boots, reflective vest and safety glasses while outside train, gloves while working on outside of train. |

| SCHEDULE/SHIFT WORK |
|---|
| One round trip is approximately 24-26 hours with an approximate 8-hour trip each way and approximately 10 hours in the bunk house between trips. Locomotive Engineers are on call and work approximately 3 times per week, up to 6 days a week. |

### MECHANICAL

| DEMAND | | TASK | FREQUENCY |
|---|---|---|---|
| Standing | ☒ Y ☐ N | Alternate with sitting as desired. Standing and walking to enter and exit train | Rarely |
| Sitting | ☒ Y ☐ N | Operating control panel. Looking outside of train | Continuously |
| Squatting | ☐ Y ☒ N | | |
| Kneeling | ☐ Y ☒ N | | |
| Walking | ☒ Y ☐ N | When inspecting locomotive unit or inside of unit if train stops | Rarely |
| Climbing | ☒ Y ☐ N | Climbing ladder to get on/off unit | Rarely |
| Bending | ☒ Y ☐ N | Back flexion (bending forward) to retrieve items from floor level (bags) | Rarely |
| Lifting 10-23 kg (22-50 lbs) | ☐ Y ☒ N | | |
| Lifting 23-45kg (50 -100 lbs) | ☐ Y ☒ N | | |
| Lifting 45 + kg (100+lbs) | ☐ Y ☒ N | | |
| Reaching | ☒ Y ☐ N | To operate control panels forward, horizontal, above head and below waist | Occasionally |
| Twisting | ☐ Y ☒ N | | |
| Pushing/ Pulling | ☐ Y ☒ N | | |
| Crawling | ☐ Y ☒ N | | |
| Handling | ☐ Y ☒ N | | |
| Carrying 10-23kg (22-50 lbs) | ☒ Y ☐ N | Carrying case/bag with books/paperwork | Rarely |
| Carrying 23-45kg (50 -100 lbs) | ☐ Y ☒ N | | |
| Carrying 45+kg (100+lbs) | ☐ Y ☒ N | | |
| Grasping | ☒ Y ☐ N | Pulling the throttle, air brakes, engine brakes, brake, horn, 2.5-18 lb initial force and no sustained forces. Gripping and handling controls and signals in palmar and power grip | Occasionally |
| Vision/ Auditory | ☒ Y ☐ N | Receives and responds to instructions by radio, hand signal, or communicating signal. Observes track, signals, equipment and other railway personnel to detect any signal or condition that affects the movement of the locomotive unit. Hand/eye coordination for driving. Conversation with train conductor and with Railway Traffic Control (RTC). | Continuously |

| ENVIRONMENTAL / PHYSICAL | | | |
|---|---|---|---|
| **DEMAND** | | **TASK** | **FREQUENCY** |
| Vibration | ☒ Y ☐ N | Vibration of moving locomotive unit | Continuously |
| Noise | ☒ Y ☐ N | Locomotive noise, hearing protection is not required (must shout to communicate) | Continuously |
| Temp Extremes | ☒ Y ☐ N | Works in heated locomotive engine (no air conditioning). Works outside in all weather conditions | Continuously |
| Radiation | ☐ Y ☒ N | | |
| Work at height | ☒ Y ☐ N | Must climb ladder to get on/off unit | Occasionally |
| Uneven surfaces | ☒ Y ☐ N | Walking across coarse gravel on train tracks to enter and exit train. | Occasionally |
| BIOLOGICAL | | | |
| **DEMAND** | | **TASK** | **FREQUENCY** |
| Blood, body fluids | ☐ Y ☒ N | | |
| Bacteria / Viruses | ☐ Y ☒ N | | |
| Moulds / Fungi | ☐ Y ☒ N | | |
| CHEMICAL | | | |
| **DEMAND** | | **TASK** | **FREQUENCY** |
| Dusts | ☐ Y ☒ N | | |
| Fumes | ☒ Y ☐ N | Diesel fumes | Rarely |
| Dangerous Goods | ☐ Y ☐ N | | |
| COGNITIVE/ PSYCHOSOCIAL | | | |
| **DEMAND** | | **TASK** | **FREQUENCY** |
| Working Alone | ☐ Y ☒ N | | |
| Interact with public | ☐ Y ☒ N | | |
| Shift work | ☒ Y ☐ N | Varies. Locomotive engineers are allowed at least 24 hours of rest between assignments. They are required to log 380 working hours per month. No scheduled coffee or lunch breaks | Continuously |
| Paperwork | ☒ Y ☐ N | Work manuals, route instructions, notes from conductor, tonnage profile and route plan, bulletins | Continuously |

**FREQUENCY LEGEND C/F/O/R**

Continuously > 67% of shift ♦ Frequently up to 67% of shift ♦ Occasionally up to 33% of shift ♦
Rarely up to 10% of shift

APPENDIX C



**CANADIAN PACIFIC**

**FUNCTIONAL ABILITIES FORM**
**SAFETY CRITICAL POSITIONS**

| PART 1 – INFORMATION FOR THE TREATING PHYSICIAN | TO BE READ BY TREATING PHYSICIAN |
|---|---|

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 32 of 48

**Your patient occupies a Safety Critical Position** (Locomotive Engineer, Conductor or Rail Traffic Controller) and **operates or controls the movement of trains.** Impaired performance due to a medical condition could result in a significant incident affecting the health and safety of employees, the public, property or the environment. **As a physician assessing persons occupying these positions you are responsible under the Railway Safety Act to notify the Railway Company's Chief Medical Officer if an employee has a medical condition that could be a threat to safe railway operations.**

Canadian Pacific Railway (CP) appreciates your time in completing this form and will pay you on receipt of the attached invoice. Capabilities that must be reviewed when assessing medical fitness for railway employees in Safety Critical Positions are provided with this form.

**PLEASE FOLLOW THESE STEPS:**

1. **Complete Part 4** – Functional Abilities.
2. If your patient is presenting to you as being off work for this illness or injury due to any of the following medical condition(s) (included in the Canadian Railway Medical Guidelines) then also please **complete Part 5** of this form.
   - Significant Hearing or Vision Deficits
   - Mental Disorder
   - Substance Use Disorder (abuse or dependence)
   - Severe Sleep Apnea
   - Epileptic Seizure
   - Cardiovascular Disorder
   - Diabetes
   - Opioid Pain Medication Use

   - OR, any other medical condition which may pose a threat to safe railway operations,
   - OR, you indicate that your patient is **totally unfit** for any work including non safety sensitive sedentary type office duties.
3. **Fax the completed form to the CP Occupational Health Services (OHS) at (403) 319-6803.**

| PART 2 – EMPLOYEE INFORMATION | TO BE COMPLETED BY THE SUPERVISOR |
|---|---|
| NAME OF EMPLOYEE: | EMPLOYEE NUMBER: |
| POSITION/JOB NAME: | TELEPHONE #: (    ) |
| THIS INJURY/ILLNESS IS COVERED UNDER: ☐ WCB/WSIB/CSST  ☐ WIB  ☐ STD | |
| DATE OF INJURY/ILLNESS: | MARVIN INCIDENT #: |
| NAME OF SUPERVISOR: | |
| PHONE # OF SUPERVISOR: (    ) | FAX # : **(403) 319 – 6803** |

| PART 3 – EMPLOYEE CONSENT | TO BE COMPLETED BY THE EMPLOYEE |
|---|---|

I authorize the healthcare professional who has signed this form to release to CP, i.e. my supervisor, Occupational Health Services and, where applicable, the WCB Specialist, any functional limitations and/or restrictions information that is relevant to my return to work. I also authorize my health care professional to release to and discuss information concerning my present medical condition, solely, with the office of the Chief Medical Officer, OHS, CP. Furthermore, I authorize CP to release Parts 1 through 4 of this form to the appropriate union representative for the purposes of return to work planning. I also authorize OHS, CP, to release all or a portion of the medical information that is relevant to the adjudication of any benefit claim related to my present medical condition to CP's WCB Specialist and the applicable Workers' Compensation Board (WCB) and/or Benefit Carrier. Any use and disclosure of my medical information will be in accordance with legal requirements and GP Policy 1804, Privacy of Information. This consent is valid for a period of six (6) months from the date signed below. Any medical information received by OHS will be kept in my confidential medical file.

| Employee Signature | Witness Signature | Date (dd/mm/yy) |
|---|---|---|

**PART 4 – FUNCTIONAL ABILITIES**    **TO BE COMPLETED BY THE TREATING PHYSICIAN**
**(Please ensure NO confidential medical information is included in this part of the form)**

Patient Name: _____    Date of exam on which this report is based: _____
(dd/mm/yy)

Current Pre injury/Illness SCP: ☐ Locomotive Engineer ☐ Conductor ☐ Rail Traffic Controller

☐ **FIT for the USUAL DUTIES** of this position (as described on FTW Considerations for Safety Critical Positions)
☐ Immediately ☐ As of:_____ (dd/mm/yy)

☐ **FIT for MODIFIED / ALTERNATE DUTIES:**
☐ Immediately ☐ As of:_____ Duration of modified/alternate duties: _____
(dd/mm/yy)                                                                          (week(s)/day(s))
**IF FIT FOR MODIFIED/ALTERNATE DUTIES PLEASE COMPLETE EACH SET OF CHOICES BELOW:**

**WALKING (select all that apply)**
☐ No limitations
☐ Level surfaces only, no uneven ground
☐ No prolonged periods > 30 minutes
☐ Not more than 100 meters
☐ Unable to walk without assistance (cane, crutches)

**CLIMBING AND BALANCE (select all that apply)**
☐ No limitations
☐ No stairs or vertical ladders
☐ Stairs only, no vertical ladders
☐ No working at heights

**STRENGTH (lifting, carrying, pushing, pulling)**
☐ No limitations
☐ Heavy      Over 50 lbs
☐ Medium    Up to 20 lbs regularly – 50 lbs occasionally
☐ Light        Up to 10 lbs regularly – 20 lbs occasionally
☐ Sedentary Up to 10 lbs occasionally.

**POSTURES (select all that apply)**
☐ No limitations
☐ Must be able to change from sitting to standing at own discretion
☐ No sitting duration > 30 minutes
☐ No standing duration > 30 minutes

**UPPER LIMB (select all that apply)**
☐ No limitations
☐ No above shoulder reaching: ☐ Left ☐ Right
☐ No firm gripping or twisting: ☐ Left ☐ Right
☐ No writing or keyboard use: ☐ Left ☐ Right

**OPERATING MOVING EQUIPMENT (select one)**
☐ Can operate moving equipment
☐ Should NOT operate moving equipment

**DRIVING COMPANY VEHICLES (select one)**
☐ Can drive Company vehicles (as per license)
☐ No driving of Company vehicles

**SAFETY CONCERNS (select one)**
☐ Can perform duties requiring cognition, alertness, concentration, attention, judgment, and memory.

☐ Unable to perform duties requiring cognition, alertness, concentration, attention, judgment, and memory. **(Employee may be placed in a Non Safety Sensitive Position)**

**WORK DAY DURATION (select one)**
☐ Able to work full shift
☐ Graduated Work Schedule: __hrs/day for__week(s

**PROGNOSIS:**

Complete Recovery expected: ☐ YES ☐ NO   Estimated duration of restrictions:_____week(s) ☐ Over 3 mths

Date of next appointment:_____ (dd/mm/yy)

☐ **\*\*Totally UNFIT for any work.** Date of reassessment: _____ Date of expected RTW:_____
(dd/mm/yy)                                                                          (dd/mm/yy)
**\*\*FOR WCB/WSIB/CSST CASES:** If you are indicating that your patient is "Totally UNFIT for any work" **(including non-safety sensitive, sedentary office-type duties)**, you MUST also complete the Part 5 – Medical Report and provide objective medical evidence that supports Temporary Total Disability. **In the absence of this information CP may offer temporary accommodation in non safety sensitive sedentary office type duties in accordance with WCB direction.**

**TREATING PHYSICIAN (please print)**

Name (Print):_____ ☐ Family Physician ☐ Specialist (Specify):_____

Signature:_____    Date: _____ (dd/mm/yy)

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 33 of 48

| PART 5 – MEDICAL REPORT | TO BE COMPLETED BY TREATING PHYSICIAN AS REQUIRED |
|---|---|

**COMPLETE IF YOUR PATIENT IS PRESENTING TO YOU AS BEING OFF WORK FOR THIS INJURY OR ILLNESS DUE TO ANY OF THE FOLLOWING MEDICAL CONDITION(S):**

- Significant Hearing or Vision Deficits
- Mental Disorder
- Substance Use Disorder (abuse or dependence)
- Severe Sleep Apnea

- Epileptic Seizure
- Cardiovascular Disorder
- Diabetes
- Opioid Pain Medication Use

OR

- Any other medical condition which may pose a threat to safe railway operations.

Patient Name: _____    DOB (dd/mm/yy): _____

**DIAGNOSIS (please be specific):**

A) _____    B) _____

C) _____    D) _____

**TREATMENT** – Completed and Current:  (indicate dates)

Surgery _____    Date (dd/mm/yy) _____
Hospitalization _____    Date(dd/mm/yy) _____
Rehabilitation Program _____    Date(dd/mm/yy) _____
Referrals _____    Date(dd/mm/yy) _____
Investigations _____    Date(dd/mm/yy) _____
Other _____    Date (dd/mm/yy) _____

**CURRENT MEDICATIONS:**  (name, dosage, and expected duration of use)

Name : _____  Dosage: _____  Duration: _____
Name : _____  Dosage: _____  Duration: _____
Name : _____  Dosage: _____  Duration: _____
Other(s): _____

**EFFECTS ON COGNITION:**  please provide your opinion on any adverse affects due to medication(s) AND/OR medical condition(s) as related to:

|  | NO | YES |  | NO | YES |
|---|---|---|---|---|---|
| Alertness | ☐ | ☐ | Memory | ☐ | ☐ |
| Attention | ☐ | ☐ | Mood | ☐ | ☐ |
| Orientation | ☐ | ☐ | Psychomotor functions | ☐ | ☐ |
| Judgment | ☐ | ☐ |  |  |  |

In your opinion, does your patient suffer from any medical condition that can result in sudden impairment?

☐ NO    ☐ YES, please explain: _____

In your opinion, is your patient capable of performing the duties of a Safety Critical Position?

☐ YES    ☐ NO, please explain: _____

Do you wish to discuss your patient's condition with the Company's Occupational Health Nurse?

☐ NO ☐ YES, please specify the issue: _____

**Please append copies of relevant reports from specialists, laboratory, physiotherapy, x-rays, etc.**

**Treating Physician Name (please print)**

Name (Print): _____  ☐ Family Physician ☐ Specialist (Specify): _____

Signature _____  Date: _____
(dd/mm/yy)

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 34 of 48

| PART 6 – INVOICE (SCP FAF) |
|---|

On receipt of the completed report, Canadian Pacific Railway agrees to pay to the treating physician a fee of either $75 for completion of Part 4 only and a fee of $100 for completion of Part 4 and Part 5. This fee is used as a guide. It is appreciated that in some circumstances a greater fee may be appropriate commensurate with the physician's time and the detail of the information provided. In such circumstances, a fee in accordance with the current provincial guidelines for uninsured services would be appropriate. No additional invoice is necessary. Please provide in the space below the person to whom the cheque should be made payable, and the address.

**PLEASE WRITE LEGIBLY TO ASSIST US IN PROCESSING YOUR PAYMENT**

**TO BE COMPLETED FOR PAYMENT:**

Name of Patient:

Date form completed: _____ (dd/mm/yy)

Payment made payable to:

TREATING PHYSICIAN NAME (**PRINT**):

TREATING PHYSICIAN ADDRESS:

TELEPHONE: ( ) _____       FAX: ( ) _____

**FOR CANADIAN PACIFIC RAILWAY USE ONLY**

AMOUNT:     ☐ $75 CANADIAN              ACCOUNT:65802     INVOICE #:_____

            ☐ $100 CANADIAN

COCODE: 1000                          ORDER # 7005727     ORDER: YES

SIGNATURE:_____            EMPLOYEE # 964936

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011781
PAGE 35 of 48

**Fax the completed form to CP Occupational Health Services (OHS) at (403) 319-6803**



# FUNCTIONAL ABILITIES FORM
# SAFETY SENSITIVE & NON SAFETY SENSITIVE POSITIONS

| PART 1 – INFORMATION FOR THE TREATING PHYSICIAN | TO BE READ BY TREATING PHYSICIAN |
|---|---|

Your patient occupies the following position:
☐ **Safety Sensitive Position** of _____
**These positions may** involve work with heavy moving equipment, (Machine Operators), work at heights, (Bridge/Signal Maintenance Workers, Top Lift Operators and Crane Operators) or railway policing duties. These are positions where impaired performance may put public safety at occasional risk, as well as putting at risk the safety of employees, customers, customer's employees, property or the environment.
☐ **Non Safety Sensitive Position** of _____
**These positions**, despite the terminology, may still include positions where there is some degree of safety risk. Jobs in this category include work in certain locations or in association with a potentially hazardous environment - Crew Bus Drivers, Electricians, Machinists and Labourers. In addition other Non Safety Sensitive Positions may have minimal or no safety risk such as sedentary office workers.

To assist you, capabilities for these positions may be provided with this form. Canadian Pacific Railway (CP) appreciates your time in completing the this form and will pay you on receipt of the attached invoice.

## PLEASE FOLLOW THESE STEPS TO COMPLETE THIS FORM:

1. Complete Part 4 – Functional Abilities.
2. **Fax the completed form to the Supervisor as indicated OR provide to the employee for direct submission.**
3. DO NOT PROVIDE ANY CONFIDENTIAL MEDICAL INFORMATION ON THIS FORM.
4. If you have any questions or concerns about the medical fitness to work for this individual please contact Occupational Health Services, (OHS), at 1-866-876-0879.
5. If you indicate that your patient is **totally unfit** for any work including non safety sensitive    sedentary type office duties you may be asked to complete a separate Medical Report for OHS providing objective medical evidence that supports this Temporary Total Disability.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 36 of 48

| PART 2 – EMPLOYEE INFORMATION | TO BE COMPLETED BY THE SUPERVISOR |
|---|---|

NAME OF EMPLOYEE:                                    EMPLOYEE NUMBER:

POSITION/JOB NAME:                                    TELEPHONE #: (     )

☐ SAFETY SENSITIVE POSITION _____        ☐ NON SAFETY SENSITIVE POSITION _____

THIS INJURY/ILLNESS IS COVERED UNDER: ☐ WCB/WSIB/CSST   ☐ WIB   ☐ STD

DATE OF INJURY/ILLNESS:                              MARVIN INCIDENT #:

NAME OF SUPERVISOR:

PHONE # OF SUPERVISOR: (     )          SUPERVISOR'S FAX #: (     )

| PART 3 – EMPLOYEE CONSENT | TO BE COMPLETED BY THE EMPLOYEE |
|---|---|

I authorize the healthcare professional who has signed this form to release to CP, i.e. my supervisor, Occupational Health Services and, where applicable, the WCB Specialist, any functional limitations and/or restrictions information that is relevant to my return to work. I also authorize my health care professional to release to and discuss information concerning my present medical condition, solely, with the office of the Chief Medical Officer, OHS, CP. Furthermore, I authorize CP to release Parts 1 through 4 of this form to the appropriate union representative for the purposes of return to work planning. I also authorize OHS, CP, to release all or a portion of the medical information that is relevant to the adjudication of any benefit claim related to my present medical condition to CP's WCB Specialist and the applicable Workers' Compensation Board (WCB) and/or Benefit Carrier. Any use and disclosure of my medical information will be in accordance with legal requirements and CP Policy 1804, Privacy of Information. This consent is valid for a period of six (6) months from the date signed below. Any medical information received by OHS will be kept in my confidential medical file.

| Employee Signature | Witness Signature | Date (dd/mm/yy) |
|---|---|---|

| PART 4 – FUNCTIONAL ABILITIES | TO BE COMPLETED BY THE TREATING PHYSICIAN |
|---|---|
| **(Please ensure NO confidential medical information is included in this part of the form)** | |

| Patient Name:_____ | Date of exam on which this report is based:_____<br>(dd/mm/yy) |
|---|---|

Current Pre injury/Illness position: ☐ Safety Sensitive Position of :_____
☐ Non Safety Position of :____  _____

☐ **FIT for the USUAL DUTIES of this position** (as described on FTW Considerations for SS & NSS Positions):
☐ Immediately ☐ As of:_____ (dd/mm/yy)

☐ **FIT for MODIFIED / ALTERNATE DUTIES:**
☐ Immediately ☐ As of:_____Duration of modified/alternate duties: _____
               (dd/mm/yy)                           (weeks/days)

**IF FIT FOR MODIFIED/ALTERNATE DUTIES PLEASE COMPLETE EACH SET OF CHOICES BELOW:**

**WALKING (select all that apply)**
☐ No limitations
☐ Level surfaces only, no uneven ground
☐ No prolonged periods > 30 minutes
☐ Not more than 100 meters
☐ Unable to walk without assistance (cane, crutches)

**UPPER LIMB (select all that apply)**
☐ No limitations
☐ No above shoulder reaching: ☐ Left ☐ Right
☐ No firm gripping or twisting: ☐ Left ☐ Right
☐ No writing or keyboard use: ☐ Left ☐ Right

**CLIMBING AND BALANCE (select all that apply)**
☐ No limitations
☐ No stairs or vertical ladders
☐ Stairs only, no vertical ladders
☐ No working at heights

**OPERATING MOVING EQUIPMENT (select one)**
☐ Can operate moving equipment
☐ Should NOT operate moving equipment

**DRIVING COMPANY VEHICLES (select one)**
☐ Can drive Company vehicles (as per license)
☐ No driving of Company vehicles

**STRENGTH (lifting, carrying, pushing, pulling)**
☐ No limitations
☐ Heavy    Over 50 lbs
☐ Medium  Up to 20 lbs regularly – 50 lbs occasionally
☐ Light     Up to 10 lbs regularly – 20 lbs occasionally.
☐ Sedentary  Up to 10 lbs occasionally.

**SAFETY CONCERNS (select one)**
☐ Can perform duties requiring cognition, alertness, concentration, attention, judgment, and memory.

☐ Unable to perform duties requiring cognition, alertness, concentration, attention, judgment, and memory. **(Employee will be placed in a Non Safety Sensitive Position)**

**POSTURES (select all that apply)**
☐ No limitations
☐ Must be able to change from sitting to standing at own discretion
☐ No sitting duration > 30 minutes
☐ No standing duration > 30 minutes

**WORK DAY DURATION (select one)**
☐ Able to work full shift
☐ Graduated Work Schedule: __hrs/day for__week(s)

**PROGNOSIS**

Complete Recovery expected: ☐ YES ☐ NO   Estimated duration of restrictions:_____ ☐ Over 3 months

Date of next appointment:_____ (dd/mm/yy)

☐ **Totally UNFIT for any work,** Date of reassessment: _____ Date of expected RTW:_____
                                       (dd/mm/yy)                (dd/mm/yy)

**FOR WCB/WSIB/CSST CASES ONLY:** If you are indicating that your patient is "Totally UNFIT for any work (including non-safety sensitive, sedentary office-type duties), you may be asked to complete a separate Medical Report and provide objective medical evidence that supports this Temporary Total Disability. In the absence of this information CP may offer temporary accommodation in non safety sensitive sedentary office type duties in accordance with WCB direction.

**TREATING PHYSICIAN (please print)**
Name (Print):_____ ☐ Family Physician ☐ Specialist (Specify):_____

Signature:_____ Date: _____(dd/mm/yy)
**If you have any questions or concerns about the medical fitness to work for this individual please contact Occupational Health Services, (OHS), at 1 866 876 0879**

ELECTRONICALLY FILED<br>2/21/2018 11:28 AM<br>2018-CH-02188<br>PAGE 37 of 37

**PART 5 – INVOICE (SSP & NSSP FAF)**

On receipt of the completed report, Canadian Pacific Railway agrees to pay to the treating physician a fee of $75 for the completion of this form. This fee is used as a guide. It is appreciated that in some circumstances a greater fee may be appropriate commensurate with the physician's time and the detail of the information provided. In such circumstances, a fee in accordance with the current provincial guidelines for uninsured services would be appropriate. No additional invoice is necessary. Please provide in the space below the person to whom the cheque should be made payable, and the address.

**PLEASE WRITE LEGIBLY TO ASSIST US IN PROCESSING YOUR PAYMENT**

**TO BE COMPLETED FOR PAYMENT:**

Name of Patient:_____

Date Form completed: _____ (dd/mm/yy)

Payment made payable to:_____

TREATING PHYSICIAN NAME (**PRINT**):_____

TREATING PHYSICIAN ADDRESS: _____

TELEPHONE: (      ) _____        FAX: (      ) _____

**FOR CANADIAN PACIFIC RAILWAY USE ONLY**

AMOUNT: $75 CANADIAN          ACCOUNT:65802        INVOICE #:_____

COCODE: 1000                ORDER # 7005727    ORDER: YES

SIGNATURE:_____        EMPLOYEE # 964936

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 18 of 48

**FLM/Supervisor - Fax the completed INVOICE ONLY to CP's Occupational Health Services (OHS) at (403) 319-6803 for payment processing**

# APPENDIX D

## FITNESS TO WORK ASSESSMENT FORM

NAME OF EMPLOYEE: «USUAL_FRNAME» «SRNAME»
EMPLOYEE #: «INDV_ID»
NAME OF SUPERVISOR: «MGR_FRNAME» «MGR_SRNAME»

### 1. RECOMMENDATIONS:

***This employee is fit to return to work without restrictions, in a «SAFETY_TYPE» position of «JOB_NAME».***

Return to work date: _____

***This employee is unfit for work at this time:*** _____

***This employee is fit to return to modified work, in a [Click here and type Safety Type] position.***

     -Return to modified work date: _____

     -Duration of restrictions: _____

     -Restrictions: _____

**These restrictions are temporary**

If you cannot accommodate, please advise me,           and then advise «USUAL_FRNAME» «SRNAME», that you cannot accommodate until his/her doctor lifts or modifies the restrictions.

If you can accommodate, I recommend that you arrange RTW as soon as possible. Please meet with him/her in    weeks and assess how he/she is doing. If he/she is able to return to full duties, no further follow-up is required.

If «USUAL_FRNAME» «SRNAME» is unable to return to full duties after the modified work period is over, or if you have concerns regarding his/her ability to perform his/her duties safely, please contact me.

**NOTE:** The employee must also meet other job requirements such as rules cards certification, vision & hearing screening, etc. before re-commencing employment. The employee and supervisor have a responsibility to ensure these requirements are met.

Please contact me if you have any questions.

Employee Health Advisor

**Confidentiality Reminder:** This correspondence may contain confidential and privileged information. It is intended for review only by the person(s) listed above. Please maintain confidentiality of any and all personal information and protect from unauthorized distribution or duplication. If you are not the intended recipient, please contact the sender immediately, delete this message and destroy all copies.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 39 of 48

## APPENDIX E

 **CANADIAN PACIFIC**

## RETURN TO WORK PLAN

| EMPLOYEE NAME: | EMPLOYEE #: |
|---|---|
| SUPERVISOR NAME: | |
| PRE-INJURY JOB: | LOCATION: |
| TITLE/DESCRIPTION OF MODIFIED WORK: | |

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 40 of 48

| FUNCTIONAL LEVEL: ☐ SEDENTARY ☐ LIGHT ☐ MEDIUM ☐ HEAVY |
|---|

| DATE MODIFIED WORK OFFERED: | |
|---|---|
| LOCATION OF WORK: | START DATE: |
| WORK HOURS/DAYS OF WEEK: | REVIEW DATE: |
| *WAGE RATE (HOURLY OR DAILY): $ <br><br> *Employees are paid for actual hours worked only. | END DATE: |

We are pleased to offer you a modified work assignment as described above in accordance with the functional restrictions and abilities outlined by your health care professional and/or OHS.

By signing below, you agree to work within the outlined restrictions and accept all conditions outlined.

Employee signature: _____     Date: _____

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

If you do not accept the agreement as offered, please sign below and indicate reason for refusal. For WCB cases, notification of refusal of modified work will be referred to the WCB for review.

Employee Signature: _____     Date: _____

Reason for refusal: _____

_____

_____

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Supervisor signature:_____     Date: _____

Witness/Union Rep. signature:_____     Date: _____
**ONCE COMPLETED, PLEASE SEND A COPY TO RTW COORDINATOR, LRTWC, & WCB SPECIALIST (WCB CASES ONLY) & OHS (SCP Only)**



## APPENDIX F

# CANADIAN PACIFIC

## Employee Return To Work Orientation Acknowledgement

CP's RTW program was designed to assist in the process of rehabilitation and early return to work. It is our objective to lessen the impact associated with injuries and illnesses in the workplace. As we value the well being of our employees, we are encouraging an early return to work after an injury or illness. We fully recognize and appreciate the effect an injury or illness can have on the physical and mental well being of our employees and it is our intention to minimize those consequences.

**Success in an early return to work requires the co-operation of all employees.**

I understand that if I am injured or become ill, I am expected to:

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 41 of 48

- Report all work-related injuries and illnesses immediately to my FLM/Supervisor.
- Report all absences related to non-occupational injuries or illnesses immediately to my FLM/Supervisor in the prescribed manner.
- Obtain medical attention immediately after the injury/illness.
- Inform my treating physician that CP has a return to work program by providing the physician with the relevant Functional Abilities Form (FAF) and medical forms to complete.
- Advise the treating physician that the FAF should be completed during the office visit so that it may be returned to the workplace by fax or by hand within seventy- two (72) hours.
- If the FAF is not completed during the doctor's visit, I must follow-up with the doctor to ensure that the form is faxed to the appropriate recipient in a timely manner.
- If applicable, be governed by my responsibilities under the Fitness to Work Policy.
- Provide regular written functional and medical updates from my physician as requested by my FLM/Supervisor or Regional RTW Coordinator.

I am aware of the Company's RTW Policy and acknowledge receipt of the RTW Orientation and pamphlet, and understand it is my responsibility to be familiar with all procedures contained therein.

**Employee Name:**_____

**Employee's Signature:**_____

**Orientation Facilitator Name:**_____
**(FLM/Supervisor)**

**Today's Date:**_____

## APPENDIX G



**CANADIAN PACIFIC**

# Return To Work Program Pamphlet

**If you are injured or become ill it is your responsibility to:**

- Report all work-related injuries and illnesses immediately to your FLM/Supervisor.

- Report all absences related to non-occupational injuries or illnesses immediately to your FLM/Supervisor in the prescribed manner.

- See your physician for appropriate care and treatment and to determine when participation in the Return to Work program is appropriate.

- Advise the treating physician that the FAF should be completed during the office visit so that it may be returned to the workplace by fax or by hand **within seventy- two (72) hours.**

- If the FAF is not completed during the doctor's visit, you must follow-up with the doctor to ensure that the form is faxed to the appropriate recipient in a timely manner.

- Comply with recommendations of treatment provider(s).

- Attend all medical or rehabilitation appointments as required.

- While participating in the Return to Work program, maintain regular contact with your physician and FLM/Supervisor advising of progress or concerns and working together to make adjustments as necessary to ensure every opportunity for your successful return to work.

- If unable to continue with the return to work plan, provide and outline reasons for discontinuing by providing supporting documentation in a timely manner i.e. updated Functional Abilities Form.

- For injuries that result in lost time, maintain contact by telephone with your FLM/Supervisor at least once per week.

- Supply updated medical assessments (in the form of Functional Abilities Forms, physician notes, WCB/WSIB physician reporting forms, etc) to your FLM/Supervisor as requested by your FLM/Supervisor.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 42 of 48

# APPENDIX H

## CORE RETURN TO WORK COMMITTEE:
## TERMS OF REFERENCE

**Committee Name:**

Canadian Pacific Core Return to Work Committee (CRTWC)

**Constituency:**

The Core Return to Work Committee represents the interests of Canadian Pacific employees in the Return to Work (RTW) polices and programs within the scope of the Canadian Operations.

**Mandate:**

The CRTWC provides a forum for senior union representatives to provide recommendations and feedback to the Company regarding the Company's return to work program and policy.

**Responsibilities:**

**The Committee is responsible for, but not limited to, the following activities:**

- Reviewing the Company's RTW policy and program and provide recommendations to ensure it remains in step with legislation and best practices.
- Recommending policy direction and monitors the RTW program to ensure it operates according to policy and procedure.
- Educating management and Unions about their obligations under the RTW program and ensure the effective implementation of the program in the Company's and Unions mainstream processes.
- Promoting accountability among functional groups and all stakeholders to meet their responsibilities under the Company's RTW program.
- Identifying and recommending changes to systemic barriers that may negatively affect the RTW process.
- Acting as a resource regarding the Company's RTW program for other key stakeholders, other Company Committees and external resources.
- Considering and expeditiously disposing of RTW issues raised by members of the committee or referred to the committee by Local Return to Work Committees.
- Monitoring data on injuries and illness and the return to work program.

**Accountability:**

The VP Operations will regularly update the HSSE Committee on the performance and efficiency of the RTW program.

**Dispute & Issue Escalation Process:**

In the event an issue cannot be resolved by the CRTWC the VP Operations will review and render a decision.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 43 of 48

**Membership:**

The CRTWC will consist of the following representatives:

| UNION | MANAGEMENT | ADVISORS (EX-OFFICIO) |
|---|---|---|
| TCRC (RAIL) | VP, Operations | Chief Medical Officer |
| TCRC (MOW) | General Manager, Track Programs & Equipment | Director, Employee Relations & Chief Privacy Officer |
| CAW | Director, Talent Acquisition & Development | Manager Labour Relations |
| USW | AVP, Transportation | Director, Benefits |
| CPPA | Return To Work Manager | Manager, Occupational Health Services |
| IBEW | | |

Committee membership will be reviewed annually.

**Co-Chairpersons:**

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 44 of 48

- The committee shall have two Chairpersons; one representing management and the other representing the Unions. The employee members will select one of the Chairpersons and the employer members will select the other. In the event only one Chairperson is present at the meeting, he or she will chair the meeting.

- The responsibility of the Chairperson(s) is to conduct the meeting in an orderly manner and have full knowledge of the agenda.

- The Chairperson(s) must ensure that the agenda is prepared and distributed prior to the meeting.

- The Chairperson(s) must ensure items and issues presented and discussed at meetings are done within the time frame indicated.

- The Chairperson(s) must keep the discussion to the point yet encourage full participation.

- The Chairperson(s) should ensure prompt follow-up of items pertaining to the committee through contact with those with the authority to implement the decisions/recommendations.

**Expectations of members:**

It is expected that committee members will:

- Attend and actively participate in all duties and functions of the committee.

- Make every effort possible to complete assigned action items by the agreed upon date.

- Annually review the Terms of Reference which are to be signed by both Co-chairperson(s) on behalf of this committee.

- Contribute to setting objectives and standards for this committee, and help implement them.

- Contribute to the continuous improvement of the RTW policy and program.

- Heighten the profile and visibility of the RTW policy and program.
- Act as coordinator for the set of stakeholders in their area of control.

### Meetings:

- The committee will meet during regular working hours as required.
- Additional meetings may be requested by co-chairs and may be held as a result of an emergency or other special circumstances.
- Meetings will be held during regular working hours, if at all possible, and may be conducted by telephone conference.
- An alternate is necessary to attend if a member is unable to attend.
- All matters will be handled or disposed of by consensus.

### Records:

The committee shall ensure that accurate records are kept of all matters that come before it and that minutes are kept of its meetings.

### Agendas and Minutes:

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 45 of 48

- Committee members will undertake to submit new business items to the co-chair(s) 2 weeks prior to the CRTWC meeting so that the Secretary can include these on the agenda. A time frame for these topics shall be provided and be indicated on the agenda.
- Items not on the agenda may be brought forward with the understanding that further investigation may be required for proper response and may be deferred to the next meeting if required.
- An agenda and other pertinent information will be prepared by the Secretary, under the direction of the Manager Return to Work and distributed to members 10 days prior to the meeting.
- Minutes will be prepared within 2 weeks following the meeting date and will be reviewed by the Co-chairpersons prior to distribution.

### Sub Committees:

The committee has the right to establish or appoint sub-committees to work through specific program or policy development on an as needed basis. The respective committee members will select sub-committee members and designate a chair.

### Guests:

- Any member may invite additional person(s) to attend the meeting to provide additional information and comment, but they shall not participate in the decision making of regular business items of the meeting.
- The co-chairpersons must be notified no later than 2 weeks prior to the meeting of any guests that will be invited to the meeting and their attendance will be shown on the proposed agenda.
- Unionized invited guests will not be compensated for attendance by the Company.

| Mgt Co-Chairperson | Union Co-Chairperson |
| Date | Date |

# APPENDIX I

# LOCAL RETURN TO WORK COMMITTEES: TERMS OF REFERENCE

## Committee Name:

Canadian Pacific Local Return to Work Committee (LRTWC): <Insert Region and Functional Group>

## Constituency:

The LRTWC represents the interests of Canadian Pacific's unionized employees in the Return to Work program within the scope of the <Insert Region, Functional Group and Relevant Bargaining Unit>

## Mandate:

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 46 of 48

The LRTWC mandate is to assist the Company in an early and safe return to meaningful work of an employee who is absent from work due to injuries and illnesses and bona fide requests for workplace accommodation due to disability.

The LRTWC consists of one local management representative and one local union representative from the appropriate bargaining unit selected by the Union.

The FLM/Supervisor will involve the committee members in return to work discussions when:

- The LRTWC members are readily available as to not delay the RTW Process
- Required by the applicable Collective Agreement
- The proposed accommodation and return to work plan pertains to collective agreement or cross craft/cross bargaining unit issues and/or may affect the rights (e.g. seniority rights) of other employees under collective bargaining agreements.
- The ill or injured employee informs their manager they want their LRTWC member present during discussions regarding accommodation and return to work plans.

## Responsibilities:

The members of the LRTWC are responsible for:

- Receiving and reviewing all applicable FAFs, Fitness to Work Assessments, and RTW plans within their area of responsibility
- Assisting the FLM/Supervisor and the Regional RTW Coordinator in the return to work and accommodation plans of unionized employees.
- Providing guidance to key stakeholders and promoting accountability in their sphere of influence regarding responsibilities and obligations under the Duty to Accommodate and RTW Program.
- Considering and expeditiously disposing of matters concerning local return to work and accommodation issues referred to them.
- Developing, implementing and maintaining an appropriate file system for all information relating to employees participating in the RTW Program including, but not limited to, FAFs, Fitness to Work Assessments, RTW plans, and RTW Meeting notes/minutes.

- Ensuring LRTWC activities during regular work hours are approved by the appropriate FLM/Supervisor prior to their commencement.
- Progress RTW cases to the appropriate senior union representatives and senior manager(s) when required or deemed necessary

### Accountability:

The LRTWC is accountable to the Service Area Manager, (SAM), or equivalent for the region and functional group it represents.

### Dispute & Issue Escalation Process:

In the event an issue cannot be resolved by the LRTWC, the management representative on the Committee will advance the issue to the SAM or equivalent for resolution. In complex cases and permanent disability accommodation cases, the SAM or equivalent will consult with Senior Management, (AVP, VP), RTW Manager, and Senior Union Representatives, (General Chairman, Vice Chairman, Vice President), for guidance and resolution.

### Expectations of the committee members:

It is expected that LRTWC members will:

- Abide by these Terms of Reference.
- Attend and actively participate in all duties and functions of the committee as expeditiously as possible.
- Make every effort possible to complete assigned action items by the agreed upon date.
- Contribute to the ongoing improvement of the Return to Work Program.
- Heighten the profile and visibility of the Return to Work Program in their area of accountability.
- Ensure that their alternate member is available in their absence and is familiar with any assignment currently being handled by them.

### Membership & Participation:

- The LRTWC will consist of a local management representative and a local union representative from the appropriate bargaining unit selected by the union.
- An alternate member is required should a member be unable to attend a scheduled RTW meeting or teleconference.

- RTW meetings will be convened as required by the FLM/Supervisor.
- RTW meetings will take place during regular working hours as expeditiously as possible, following receipt of the relevant functional and return to work information of the affected employee.
- Additional RTW meetings may be requested by a member and may be held as a result of an emergency or other special circumstances.
- RTW discussions may be held face to face or may be conducted by telephone conference in order to expedite the RTW Plan.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 47 of 48

### Records:

The management representative on the committee shall ensure that accurate records are kept of all matters that come before it regarding individual return to work plans and that minutes or notes are kept of any RTW discussions. Copies of these minutes, notes and other documents will form part of the return to work file held by the Regional RTW Coordinator.

The management representative will ensure that these records are maintained in accordance with CP's Privacy Policy and individual employee information will be restricted to those individuals directly involved in the return to work plan. Return to work case information will be limited to functional ability and restrictions information only. No confidential medical information will be maintained or recorded by the LRTWC.

The union representative on the committee will also maintain accurate records of all matters that come before it regarding individual return to work plans and that minutes or notes are kept of any RTW discussions. The union representative will be responsible for forwarding this information to their senior union representatives as required.

### Payment for Committee Work:

All time spent for RTW meetings, functions, or activities relating to the function of the return to work program shall be deemed to be time spent at work at the regular rate of pay.

### Guests:

Any member may invite additional person(s) to attend the RTW meetings to provide additional information and comment, such as Regional Return to Work Coordinators or Employee Health Advisors. Union represented and invited guests will only be compensated by the Company with prior approval of the FLM/Supervisor.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 48 of 48

_____          _____
Mgt  Representative                   Union Representative
Date                                  Date

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
CALENDAR: W
PAGE 1 of 9
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

# EXHIBIT D

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To: **Neil Reyes**
c/o Kara Amouyal, Esq.
The Blake Horwitz Law Firm, Ltd.
111 W. Washington, Suite 1611
Chicago, IL 60602

From: **Chicago District Office**
**500 West Madison St**
**Suite 2000**
**Chicago, IL 60661**

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2017-02281 | **Sarronda Harris,**<br>**Investigator** | (312) 869-8025 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

ELECTRONICALLY FILED<br>2/21/2018 10:28 AM<br>2017-L-011381<br>PAGE 2 of 9

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

Enclosures(s)

**Julianne Bowman,**
**District Director**

11/21/17
(Date Mailed)

cc: **SOO LINE RAILROAD COMPANY D/B/A**
**CANADIAN PACIFIC**
c/o Nicole L. Faulkner
**Stinson Leonard Street**
**150 South Fifth Street, Suite 2300**
**Minneapolis, MN 55402**

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 440-2017-02281 |

**Illinois Department Of Human Rights** and EEOC

*State or local Agency, if any*

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Neil Reyes | (773) 398-4084 | 1978 |

**Street Address** City, State and ZIP Code
8711 W. Bryn Mawr, #406, Chicago, IL 60631

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| CANADIAN PACIFIC RAIL SYSTEM | 500 or More | (630) 860-4887 |

**Street Address** City, State and ZIP Code
11306 Franklin Ave., Franklin Park, IL 60131

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

**Street Address** City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest          Latest

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See attached.

RECEIVED EEOC

MAR 10 2017

CHICAGO DISTRICT OFFICE

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

| 3-9-17 | Neil Reyes |
|---|---|
| Date | Charging Party Signature |

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

ELECTRONICALLY FILED
2017 PACER





# THE BLAKE HORWITZ LAW FIRM, LTD

Blake Horwitz, Esq.

*Associates*
Uma Bansal, Esq.
Kara Amouyal, Esq.
Jared Kosoglad, Esq. (Of Counsel)

February 23, 2017

**RECEIVED EEOC**

**VIA U.S. MAIL AND FACSIMILE**
Equal Employment Opportunity Commission
Chicago District Office
500 West Madison Street, Suite 2000
Chicago, Illinois 60661
312-869-8200

MAR 0 2 2017

CHICAGO DISTRICT OFFICE



ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-001381
PAGE 4 of 9

### Re: Neil Reyes Complaint Initiation

To Whom it May Concern,

Please accept this letter as an official complaint of racial discrimination, disability discrimination (perceived), and retaliation on behalf of Neil Reyes. In addition, please accept this letter as an appearance by his retained attorney Kara Amouyal, Esq. of The Blake Horwtiz Law Firm, LTD. on behalf of Mr. Reyes.

Factual Background

The Canadian Pacific ("CP") rail company hired Neil Reyes, an Asian Male, as an investigator in 2010 as part of their private police force. The CP police force provides security and logistics for Canadian Pacific Rail; part of the force is in Canada and part in the United States. The command structure of the United States portion of the CP police force is as follows: Deputy Chief – Commander – Sergeant – Special Agent[1]. At the time that Mr. Reyes was hired, there were no minorities above the rank of Special Agent (e.g., Sergeant, Commander, or Deputy Chief).

---

[1] The CP Police force does not use the term "officer", but a Special Agent is akin to an officer ranking in other police forces.

The Blake Horwitz Law Firm, LTD.
111 W. Washington St., Suite 1611, Chicago, IL 60602
Phone: (312) 676-2100          Fax: (312) 445-8741



ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 5 of 9

## Unequal Pay and Treatment

In 2012, Mr. Reyes was promoted to the position of sergeant. With this promotion, he became the first and only minority sergeant in the entire continental United States. Further, he was the only CP police supervisor with any minority employees working under him.

Since being promoted to sergeant in 2012, Mr. Reyes has suffered numerous injustices due to his race. He has been the subject of racial harassment, his employment terms and conditions have been inferior compared to his white peers, his compensation and fringe benefits were worse, and he was eventually retaliatorily and/or discriminatorily discharged.

First, Mr. Reyes had a larger work burden and less desirable assignments than his white peers. As the EEOC compliance manual states *"work assignments are part-and-parcel of employees' everyday terms and conditions of employment and are also important for gaining valuable on-the-job experience. Work assignments must be distributed in a nondiscriminatory manner"*. In addition to his sergeant duties, Mr. Reyes was responsible for United States staff training, catering for staff meetings, as well as taking his commanding officer's car to the carwash. He was also responsible for organizing uniform orders and conducting fleet management for the entire United States. On multiple occasions, he was forced to pick up Deputy Chief Walker's car from Midway Airport. One especially demeaning incident occurred in April of 2016 when Sergeant Reyes and one of his subordinates (also a minority) was forced to program and deliver the new video recording system modules in the squad cars for the entire United States fleet. When Deputy Chief Walker saw Mr. Reyes and the other Agent executing the task, Deputy Chief Walker laughed and said "I thought you guys were cops, not IT". No other sergeant, all of whom were white, had any of these menial responsibilities.

Second, prior to Mr. Reyes accepting his promotion, he was told that his duties and responsibilities was primarily to act as a field supervisor for Special Agents assigned to Illinois. Approximately three months following Mr. Reyes' promotion to Sergeant, his responsibilities, expectations, and role suddenly changed. Mr. Reyes was now expected to research, develop, and integrate a process and procedure in several counties to issue traffic citations, make arrests, and gain access to an Illinois state police data base. None of Mr. Reyes' predecessors, all of whom were white, were required to take on such a huge undertaking and were all paid significantly more. The standard, expectations, and bar were raised for Mr. Reyes as compared to his white predecessors and white peers. Additionally, other Sergeants in other territories, all of whom are also white, were not required to perform these same responsibilities. Mr. Reyes was consistently pressured and scolded to complete these items with very little support from his upper command staff.

2




ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 6 of 9

Third, on several different occasions, Mr. Reyes was forced by Commander Law to clean the office, throw out the trash, and organize the storage room despite the fact that the CP Railroad has a contracted cleaning service that cleans the office regularly. Mr. Reyes has organized the storage room several times throughout the years but continued to get harassed by Commander Law to make it better because it was not good enough. On one occasion, Mr. Reyes confronted Commander Law and stated that his white predecessor never had the storage room as organized and clean as he had made it. Commander Law completely agreed but continued to force Mr. Reyes to complete the task.

Fourth, once he was promoted to sergeant, Mr. Reyes' compensation and benefits were not comparable to those of the other (white) sergeants. As the EEOC compliance manual states, *"Employees must receive compensation without regard to race. All forms of compensation are covered, such as salary, overtime pay, bonuses, stock options, expense accounts, commissions, life insurance, vacation and holiday pay, and benefits"*. When Mr. Reyes was initially promoted to sergeant, his salary was $63,000, the minimum allowed for the position of Sergeant at the time. However, he had subordinates who were making as little as $1,000 less than him and as much as $8,000 more than him. Throughout his first three years as sergeant, he made significantly less than his white peers for doing comparable, if not more, work.

A thorough examination of Mr. Reyes' fringe benefits reveals that his were significantly worse in every category. While every single other sergeant had a take home squad car, Mr. Reyes did not for many years. Mr. Reyes had significantly less vacation time than any of the other Sergeants as well. Finally, while all other white Sergeants had their own office, Mr. Reyes did not even have his own workspace. Some of these issues, such as his workspace were never rectified; others, such as his lack of a squad car, took three years to equalize.

Specific Instances of Harassing Conduct or Unequal Treatment

In early 2016, Commander Law, the CP police commander to whom Mr. Reyes reported, openly admitted to Mr. Reyes that it was likely that Mr. Reyes had been subjected to racial discrimination. Commander Law even admitted to Mr. Reyes that white males with blonde hair and blue eyes would typically be more successful in the workplace. Because Mr. Reyes did not and could not exhibit these physical characteristics, Commander Law recommended several books to improve Mr. Reyes' "other" (i.e., non-racial) strengths.

In or around August of 2016, Mr. Reyes asked Commander Law why the Illinois detachment of the CP police was prohibited from carrying their weapons off-duty when other detachments were allowed to do so. Mr. Reyes believed that Illinois law would not prohibit such actions and requested legal review by CP counsel or further explanation regarding the CP decision. When Commander Law told Mr. Reyes that Commander Law did not want to discuss the issue further, Mr. Reyes brought to Commander Law's attention the fact that other, all-white, detachments were allowed to carry their weapons under less restrictive concealed carry laws off-duty despite violating the local laws for those detachments while the Illinois detachment (with minorities) was not allowed to do so. Upon information and belief, Commander Law discussed this conversation with

3



Deputy Chief Walker (the Deputy Chief of the entire police force). On or around September 8, 2016, Deputy Chief Walker singled out Mr. Reyes in front of the entire department several times regarding this issue and screamed at Mr. Reyes.

In early September, 2016, Commander Law also accused Mr. Reyes of being in a clique with two Hispanic special agents. However, Commander Law did not raise the same concerns with white male employees who were friendly. Once Mr. Reyes began to work more closely with white male special agents, Commander Law did not criticize Mr. Reyes further.

<u>November 9, 2016 Conversation</u>

On or around November 9, 2016, Mr. Reyes had a conversation with Commander Law regarding CP's new policy (going into effect on January 1, 2017) that special agents would not be allowed to hold secondary employment. Previously, Mr. Reyes had asked CP for an extension of time on the policy's effect for him due to his unique financial circumstances – Mr. Reyes' wife is pregnant and in addition to preparing for a new baby, Mr. Reyes and his wife sent all his secondary employment money to his wife's parents in Guatemala and were in the process of applying for U.S. residency for his wife's parents (an expensive endeavor). CP denied his request and Mr. Reyes approached Commander Law on November 9 to discuss the request.

During the November 9th conversation, Mr. Reyes discussed with Commander Law the stress that Mr. Reyes was under following the denial of his extension request. Commander Law suggested that Mr. Reyes start his planned vacation early and, in response, Mr. Reyes joked that Mr. Reyes could not afford to go on vacation and that Mr. Reyes would be better off if he jumped in front of a train and won the CP lottery; this joke is commonly made among CP police staff. Commander Law and Mr. Reyes continued talking and, during the course of the conversation that occurred after the joke, Mr. Reyes commented to Commander Law that Mr. Reyes knows about the above-discussed unequal pay and unequal treatment that Mr. Reyes suffers as compared to the other (white) Sergeants. Mr. Reyes also told Commander Law that although Commander Law had always maintained that the decision to give Mr. Reyes an initial sergeant salary lower than that of the white sergeants was made by CP Human Resources, that Mr. Reyes had requested a copy of his personnel file and had learned that Commander Law had in fact taken part in that decision.

After Mr. Reyes confronted Commander Law with these facts, Commander Law ended the conversation and drove Mr. Reyes home.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 7 of 9

4

 

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 8 of 9

## Retaliation and/or Discrimination Based on Perceived Disability

Commander Law later told multiple special agents that Mr. Reyes was suicidal and contacted Deputy Chief Walker. Commander Law and Deputy Chief Walker came to Mr. Reyes' home a few hours later and retrieved Mr. Reyes' department-issued firearm. Mr. Reyes was placed on administrative leave.

The following day, Mr. Reyes had a conversation with Deputy Chief Walker to discuss the incident with Commander Law. Mr. Reyes reported to Deputy Chief Walker that Mr. Reyes felt as if Commander Law was discriminating against Mr. Reyes and explained to Deputy Chief Walker that Mr. Reyes had discovered that Commander Law had lied about the decisions surrounding Mr. Reyes' initial sergeant salary. Deputy Chief Walker became upset and said that this was the 2nd time that Mr. Reyes had mentioned a lawsuit and that Mr. Reyes has to "knock that shit off". Mr. Reyes accepted the false accusation of being suicidal and agreed to go through CP's process for returning to work.

On November 18, 2016, Mr. Reyes received a letter from Commander Law stating that because Mr. Reyes was in a safety sensitive position, Mr. Reyes needed to be cleared by his treating medical provider to return to work. Mr. Reyes' treating provider completed the CP–issued paperwork on November 21, 2016. The treating provider found that Mr. Reyes was emotionally stable and did not need any accommodations to return to work and did not need any restrictions in his work.

## Retaliatory Termination and/or Discrimination Based on Perceived Disability

Despite this, CP never returned Mr. Reyes to work. Mr. Reyes was terminated on January 4, 2017. When he was terminated, Mr. Reyes was not granted any of the pre-termination disciplinary steps that other employees had been granted in the past. The typical process is first an informal hearing followed by a formal hearing. After the formal hearing, several different disciplinary actions can follow, including termination. Mr. Reyes was not granted any such hearing and instead simply received a termination letter. Several of his white colleagues in New York were all granted hearings before being terminated and/or disciplined; Mr. Reyes was not.

## Conclusion

Canadian Pacific Rail violated several provisions of Title VII throughout Mr. Reyes' employment. He was subjected to harassment due to his race, forced to perform inferior and menial work assignments as compared to his white peers, and given lower salary and fringe benefits that were significantly less than those received by his white peers. After complaining of this treatment, he was erroneously labeled with a disability yet not afforded any of the protections that Title VII mandates for persons with disabilities (perceived or otherwise). His termination deviated from company policy and from company practice (i.e. what his white peers have received in the past) and certainly did not follow the mandated interactive process for persons with disabilities.

We ask that all correspondence go through Mr. Reyes' counsel, Kara Amouyal, whose contact information is listed below.

We look forward to hearing from you.

Sincerely,

/s/ Kara Amouyal
Kara Amouyal, Esq.

ELECTRONICALLY FILED
2/21/2018 10:28 AM
2017-L-011381
PAGE 9 of 9

Complainant Name:   Neil Reyes
Phone:   (773) 398-4084
Address:   8711 W. Bryn Mawr #406
  Chicago, IL 60631

Attorney:   Kara Amouyal, Esq.
Email:   kamouyal@bhlfattorneys.com
Phone:   (312) 676-2100
Address:   The Blake Horwitz Law Firm, Ltd.
  111 W. Washington St., Ste. 1611
  Chicago, IL 60602

Respondent Name:   Canadian Pacific Railway
Phone:   888-333-6370
Address:   7550 Ogden Dale Road S.E.
  Calgary, AB T2C 4X9
  Canada

Number of employees:   Approximately 12,000 in the United States & Canada

6

# Law DIVISION
## Litigant List

Printed on 02/21/2018

Case Number: 2017-L-011381

## Plaintiffs

| Plaintiffs Name | Plaintiffs Address | State | Zip | Unit # |
|---|---|---|---|---|
| REYES NEIL | | | 0000 | |

Total Plaintiffs: **1**

## Defendants

| Defendant Name | Defendant Address | State | Unit # | Service By |
|---|---|---|---|---|
| LAW TODD COMMANDER | 10800 FRANKLIN | IL 0000 | | |
| WALKER BOBBY DEPUTY CHIEF | | 0000 | | |

Total Defendants: **2**